972 F.2d 1545
 Alma BOONE; Estate of James R. Coleman; T. Dudley Cramer;
James L. Dow and Betty Jo Dow, his wife; Zora Ann Evans;
Nancy Flanagan; Natalie Buck; Marshall Elmore; Marjorie
Mansfield, Trustee of the H.H. Thomas Testamentary Trust;
J.R. Mansfield, M.D.; and Cody Monte, Plaintiffs-Appellants,
Glen R. Pollard, Plaintiff-Intervenor-Appellant,
v.
CARLSBAD BANCORPORATION, INC., a New Mexico corporation;
the Carlsbad National Bank, a national banking association;
Cecil Arnold; Gerry Berg; Don Brewer; Mike Capps;
Elizabeth Capps; George Crump; A.R. Donaldson; George
Thomas Dunagan; Ronnie Firestone; Richard J. Forrest;
Robert H. Forrest; Joe Gant, III; T.E. Hauser; A. Ron
Hoffman; Barrie Hood; Ross Hyden; Ross Manganaro; Ann
Manganaro; Earl Miller; Robert C. Murray; Prentiss
O'Neal; Pam Pai; Vin Pai; James D. Renfrow; Resource
Management, Inc.; Keith Sparks; Laurence Walterscheid;
Sylvia Walterscheid; James F. Zimmerman; United States of
America; Comptroller of the Currency; Myer Rosenberg;
Sidney J. Bernard; and Federal Deposit Insurance
Corporation, in its capacity as Receiver for MBank Dallas,
N.A., Defendants-Appellees.
 No. 89-2066.
 United States Court of Appeals,
Tenth Circuit.
 Aug. 28, 1992.
 
 1
 William C. Schaab of Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, N.M., for plaintiffs-appellants.
 
 
 2
 Charles A. Gall of Jenkens & Gilchrist, P.C., Dallas, Tex. (Robert A. Johnson and James L. Rasmussen of Kemp, Smith, Duncan & Hammond, Albuquerque, N.M., with him on the brief), for defendants-appellees.
 
 
 3
 Lester N. Scall, Office of the Comptroller of the Currency, Washington, D.C. (L. Robert Griffin, Office of the Comptroller of the Currency, Washington, D.C., and Raymond Hamilton, Asst. U.S. Atty., Albuquerque, N.M., with him on the brief), for defendant-appellee Comptroller of the Currency.
 
 
 4
 David L. Swanson (Allen W. Kimbrough, with him on the brief) of Winstead, McGuire, Sechrest & Minick, Dallas, Tex., for defendant-appellee F.D.I.C.
 
 
 5
 Before HOLLOWAY and McWILLIAMS, Senior Circuit Judges, and BABCOCK,* District Judge.
 
 
 6
 HOLLOWAY, Senior Circuit Judge**.
 
 
 7
 Plaintiffs, former minority shareholders of Carlsbad National Bank (CNB), appeal from various orders in the United States District Court for the District of New Mexico whereby the court granted summary judgment on certain of plaintiffs' claims and dismissed others for failing to state a claim. The court dismissed plaintiffs' remaining state law claims by declining to exercise pendent jurisdiction. We affirm.
 
 
 8
 * THE FACTUAL BACKGROUND
 
 
 9
 The following facts, asserted in plaintiffs' second and third amended complaints, are taken as true for purposes of this appeal.[1]
 
 
 10
 This action arises from events culminating in the April 21, 1986, consolidation of CNB with the state-chartered, New Carlsbad Bank (New Bank) in a reverse triangular merger.[2] New Bank is a wholly owned subsidiary of a one-bank holding company, defendant Carlsbad Bancorporation (Holding Company).
 
 
 11
 In 1983, defendants Ronald L. Bouchier and R. Lew Bouchier began purchasing CNB common stock. Defendant MBank, Dallas (MBank), provided loans to finance these acquisitions, requiring that the stock serve as security for the loans. By March 1985, the Bouchiers had acquired approximately 61% of CNB's 250,000 outstanding shares. In April 1985, the Bouchiers defaulted on the notes secured by the stock, and MBank announced a private sale of the shares. Before the sale, however, the Bouchiers entered negotiations with the individual defendants, ten of the nineteen CNB officers who owned approximately 10% of CNB's stock. The individual defendants agreed to assume the Bouchier notes in exchange for the Bouchiers' agreement to sell their CNB stock. MBank subsequently renewed the notes.
 
 
 12
 In preparation for the stock transfer, the individual defendants organized the Holding Company on June 7, 1985, and sought approval from federal authorities to operate it as a one-bank holding company. In June and July of 1985, MBank agreed to lend $8,303,382 to the Holding Company to enable it to assume the renewed notes from the individual defendants (the acquisition indebtedness). On August 15, 1985, the Bouchiers and the individual defendants entered into a Stock Purchase Agreement whereby the Bouchiers sold their stock for $63.12 per share to the individual defendants. The individual defendants, (hereafter the Controlling Shareholders), thus gained control of over 71% of CNB's stock. Under this agreement, MBank also loaned $500,000 to the Controlling Shareholders who used this money to form New Bank, a wholly owned subsidiary of the Holding Company.
 
 
 13
 The directors of CNB, including the Controlling Shareholders, unanimously voted to approve a merger agreement between CNB and New Bank. The merger proposal was mailed to all the CNB shareholders, including plaintiffs, via a prospectus and proxy statement dated February 14, 1986. Subject to the approval of federal agencies, the merger agreement provided for consolidation of CNB and New Bank whereby CNB would be the surviving entity and would be wholly owned by the Holding Company. The merger was approved by 82% of the voting shares, well in excess of the two-thirds majority required by New Mexico law. See N.M.Stat.Ann. §§ 58-4-2, 58-4-5 (1984).
 
 
 14
 Pursuant to the merger, the 250,000 common shares of outstanding CNB stock were exchanged for 250,000 shares of the common stock of the Holding Company. Additionally, the Controlling Shareholders received a cash equivalent of $48.05 per share for their surrendered CNB stock through the assumption of the acquisition indebtedness by the Holding Company. Some Controlling Shareholders also received preferred stock in the Holding Company. Minority shareholders of CNB who did not dissent from the merger received either unsecured debentures equal to $48.05 per share, or Holding Company preferred stock. Under the terms of the merger, the Controlling Shareholders would elect all of the directors of the Holding Company. Moreover, the Holding Company pledged all of the shares of CNB acquired in the merger as security for the $8,303,382 loan from MBank.
 
 
 15
 The Holding Company offered $35 per share to the dissenting minority shareholders, including the plaintiffs. Plaintiffs refused and surrendered their stock pursuant to 12 U.S.C. § 215 in order to invoke their statutory appraisal rights. Under the statute, each side could appoint one appraiser to a three-person appraisal committee; the third appraiser would be selected by the two appointed ones. See § 215(c). Although the plaintiffs appointed W. Wood to the appraisal committee within the statutory time period, the committee was never formed due to either CNB's failure to appoint an appraiser or the failure of the two appointed appraisers to agree upon a third. Thus, there was no committee appraisal of the CNB stock under § 215(c). On September 2, 1986, CNB asked the Comptroller of the Currency (Comptroller) to conduct an appraisal pursuant to § 215(d). All interested parties were allowed to submit material to the Comptroller. On December 9, 1987, the Comptroller issued its appraisal, valuing the dissenting shares at $40.44 per share. The rejected Holding Company stock was auctioned and the proceeds in excess of the appraised value of the dissenting shares were paid to the plaintiffs.
 
 
 16
 Plaintiffs filed suit against CNB, the Holding Company, MBank, and the Controlling Shareholders, alleging various violations of federal securities laws, civil RICO, and pendent state claims based on fraud and breach of fiduciary duty. Plaintiffs sought the fair market value of their CNB stock, allegedly over $60 per share, which they claim was improperly depressed by the events leading up to and culminating in the merger. Plaintiffs also requested injunctive relief.
 
 
 17
 In a companion case, plaintiffs sued the Comptroller, the Holding Company, and CNB, alleging that the Comptroller's valuation of the minority shareholders' stock was unreasonable, arbitrary, and capricious. Plaintiffs allege that the Comptroller lacked authority to conduct the appraisal. Plaintiffs there sought only injunctive relief. The district court consolidated both of these cases.
 
 II
 STANDARDS OF REVIEW
 
 18
 The applicable standards of review are well settled: Our review of the district court's grant of summary judgment is de novo. Eaton v. Jarvis Prods. Corp., 965 F.2d 922, 925 (10th Cir.1992). Summary judgment is proper if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The record must be viewed in the light most favorable to the nonmovants, and the moving parties have the burden of showing that they are entitled to summary judgment as a matter of law. Ewing v. Amoco Oil Co., 823 F.2d 1432, 1437 (10th Cir.1987). Once this burden is carried, however, the nonmovants must designate specific facts demonstrating the existence of a genuine, dispositive issue on which they will bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).
 
 
 19
 Our standard of review for an order granting a motion to dismiss for failure to state a claim is also de novo. See Morgan v. City of Rawlins, 792 F.2d 975, 978 (10th Cir.1986). Under Rule 12(b)(6), dismissal is inappropriate unless the plaintiffs can prove no set of facts in support of their claims to entitle them to relief. Id.
 
 III
 DISCUSSION
 A. The Section 215 Claims
 
 20
 By order of July 8, 1987, the district court held that 12 U.S.C. § 215 applied to the reverse triangular merger in this case.[3] The court also determined that the Controlling Shareholders' recourse to the Comptroller for an appraisal under § 215(d) was appropriate because the appraisal remedies provided in subsections (c) and (d) were independent alternative remedies. In a subsequent ruling on November 29, 1988, the court rejected plaintiffs' claim for dividends or interest which allegedly accrued from the date of merger to the date of the auction of the rejected Holding Company shares.
 
 
 21
 On appeal, plaintiffs argue that: (1) the court erred in applying § 215 here because the statute only applies to "receiving associations," and not BHC's, which are ordinary corporations; (2) even if § 215 does apply, a good faith effort to obtain a committee appraisal pursuant to § 215(c) is a predicate to any Comptroller appraisal; (3) the court erred in failing to permit the recovery of dividends or interest; and (4) the Comptroller's appraisal methodology was arbitrary and capricious.
 
 
 22
 We disagree with plaintiffs' reading of the statute and affirm the district court's conclusions on these questions of law.
 
 
 23
 1. Application of § 215 to Reverse Triangular Mergers
 
 
 24
 Plaintiffs challenge the application of § 215 to reverse triangular mergers, arguing that the statute, by its terms and intent, does not apply to BHC's. The Fifth Circuit, however, has already rejected this view. See Martin v. Kilgore First Bancorp, Inc., 747 F.2d 1024 (5th Cir.1984). In Martin, the plaintiffs argued there that § 215 could not apply because the BHC was "a Texas corporation, not a national banking association" as mentioned in the statutory text. The Fifth Circuit explained, however, that:
 
 
 25
 The ambiguity of the statute is the result of changes in the forms of entities now used to conduct banking business. Reverse triangular mergers ... were not devised until the mid-1960's. Section 215(d) was enacted in 1918 and last amended in 1959. Congress has not further modified the statute to accommodate newly developed merger mechanisms such as that presented here despite the fact that the Comptroller and the Federal Reserve System have consistently recognized the use of these new business forms and merger procedures.
 
 
 26
 Id. at 1027.
 
 
 27
 We are persuaded by this analysis and agree that we should defer to the Comptroller's interpretation of § 215 as being applicable to reverse triangular mergers. This interpretation "represents a reasonable construction of the language and is consistent with the legislative intent." Id.
 
 2. The Comptroller's Authority to Appraise
 
 28
 Plaintiffs also challenge the authority of the Comptroller to conduct an appraisal prior to completion of a committee appraisal pursuant to § 215(c). They assert that resort to the Comptroller, if at all, must come at the behest of dissenters who are dissatisfied with a committee appraisal.
 
 
 29
 We conclude that the district court correctly rejected this challenge. As the court noted:
 
 
 30
 The plain language of section (d) provides that the Comptroller shall perform an appraisal upon the request of 'any interested party,' 'for any reason.' ... The statute, by its terms, does not require committee appraisal. This court declines to require an appraisal under section (c) when the statute itself has not done so.
 
 
 31
 III R. (Pleadings) Doc. 118, at 8.
 
 
 32
 The court expressly found that defendants had not purposefully delayed in appointing an appraiser to the committee. See Tr. July 28, 1986, at 112. However, even accepting plaintiffs' allegations of defendants' bad faith as true, Congress has declared that the Comptroller shall appraise the dissenting stock if the committee fails to appraise it "for any reason"--indicating that a party's bad faith is irrelevant. The statutory language reveals that Congress limited resort to committee appraisals to "ninety days from the date of consummation of the consolidation." § 215(d). Upon the failure to obtain a committee appraisal within this time frame, "any interested party [can] cause an appraisal to be made" by the Comptroller. Id. Plaintiffs' unsupported assertion that the Comptroller routinely undervalues stock does not permit us to deny the Comptroller the authority to appraise when the terms of § 215(d) are met. Plaintiffs do not dispute that the time period specified in § 215(d) had elapsed without a committee appraisal and that the defendants are "interested part[ies]" who have made a written request for an appraisal. The statute requires no more.
 
 3. Interest or Dividends Pending Auction
 
 33
 The district court also refused to permit plaintiffs to amend their complaint to assert a claim for interest or dividends under § 215. The court ruled that such an amendment would be futile because the plaintiffs had failed to state a claim upon which relief could be granted. See XI R. (Pleadings) Doc. 245, at 26-28.
 
 
 34
 We agree that as a matter of law this amendment would have been futile because § 215 does not provide the remedy sought. The district court correctly rejected plaintiffs' assertion that the Holding Company should have issued the stock and held it in trust until the sale. By its terms, " § 215(d) does not require issuance, as of the date that dissenting shareholders surrender their shares, of stock that is to be sold at auction under the statute. Section 215(d) also does not require interest to be paid on the stock during the pendency of the appraisal." Id. at 27; see also Keeffe v. Citizens & Northern Bank, 808 F.2d 246, 252 (3rd Cir.1986) (creation of such remedies must lie with Congress); Yabsley v. Conover, 644 F.Supp. 689, 697 (N.D.Ill.1986) (parallel statute and implementing regulations do not create an expectation of an interest award).
 
 
 35
 Accordingly the district court properly refused to allow plaintiffs to proceed on their claim for dividends and interest.
 
 4. The Comptroller's Appraisal
 
 36
 Plaintiffs assert numerous failings in the methodology employed by the Comptroller in appraising their stock. We hold, however, that the district court properly granted summary judgment for the Comptroller on plaintiffs' claim that the appraisal was unreasonable, arbitrary, and capricious.
 
 
 37
 As noted by the district court, § 215 contains no guidance for the Comptroller's appraisal. Thus, a court's inquiry is restricted to whether the appraisal was based on a consideration of the relevant factors and whether there has been a clear error of judgment. See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971); Yabsley, 644 F.Supp. at 693; see also Administrative Procedure Act, 5 U.S.C. § 706(2)(A) ("APA").
 
 
 38
 For the same reasons stated by the district court, we agree that the Comptroller's appraisal was neither unreasonable nor arbitrary and capricious. The Comptroller conceded that there "are several methods of estimating the value of a bank's shares." I R. (Pleadings) Doc. 1, Ex. A, Report of Appraisal of Dissenting Shareholders' Stock at 1 (Comptroller's Appraisal). Nevertheless, its decision to choose the Delaware Block Methodology cannot be faulted.[4] Although the plaintiffs correctly indicate that this methodology has been criticized, see, e.g., Weinberger v. UOP, Inc., 457 A.2d 701, 712 (Del.1983) (describing method as "outmoded"), nevertheless, "the fact that the Comptroller was following a conventional approach goes far to shield his results from judicial invalidation. It is not for a reviewing court to tell an administrative agency to defy the conventional wisdom, to innovate, to be daring." Beerly v. Department of the Treasury, 768 F.2d 942, 945-46 (7th Cir.1985). Mere use of the Delaware Block Method does not render the appraisal arbitrary and capricious.
 
 
 39
 In appraising plaintiffs' CNB stock, the Comptroller assigned no weight to the market value of the stock because the stock was thinly traded during the three years preceding the merger and because "most of the trades of CNB stock took place between insiders and/or control groups." The Comptroller determined the investment value of CNB stock by analyzing CNB's historical earnings data and comparing the same with a peer group of banks for which market data was readily available. The adjusted book value of CNB stock was determined by multiplying the book value of CNB's assets per share times the median ratio of market priced book value for the peer group. The Comptroller determined the investment value to be $42.89 per share and the adjusted book value to be $33.09 per share, which it then weighted at 75% and 25%, respectively. The resulting appraised value for the dissenting stock was $40.44 per share. See Comptroller's Appraisal at 2-7.
 
 
 40
 Plaintiffs argue that the peer banks selected were inappropriate because they were not New Mexico banks; that they had not themselves been individually appraised using the same "market standards" applied to reject the New Mexico banks for comparison; and that instead a simulated market value for their shares had been developed from merely arithmetical calculations. Plaintiffs also complain that the Comptroller's weight values between investment value and adjusted book value are unsupported by the record.
 
 
 41
 We believe that the Comptroller's application of its chosen methodology was reasonable. The Comptroller assigned no weight to either market or book value. This decision accords with views frequently expressed by courts that "market value should not be taken into account when the stock is too thinly traded, ..., or where the market for stock is not dependable." Keeffe, 808 F.2d at 250 (citations omitted).[5] Moreover, "[t]here is nearly complete agreement that book value does not accurately represent the fair value of corporate assets." Note, Valuation of Dissenters' Stock Under Appraisal Statutes, 79 Harv.L.Rev 1453, 1457 (1966). Thus, the Comptroller's rejection of these measures was within reasonable bounds.
 
 
 42
 As indicated by the district court, the Comptroller employed many of the factors for selecting peer banks which plaintiffs submitted to the agency through their appraiser Wood. The Comptroller identified the criteria used for selecting the peer banks, see Comptroller's Appraisal at 4 (listing factors), and specifically explained the absence of peer New Mexico banks as attributable to "the lack of published data" relevant to these criteria. Id. We agree with the district court that the "[s]election of a peer group is a discretionary act" because the term is not statutorily defined and it involves familiarity with factors particularly within the Comptroller's expertise. See Yabsley, 644 F.Supp. at 695.
 
 
 43
 As to the decision to weight the investment value more heavily than the adjusted book value, we find the Comptroller's explanation adequate: the weights assigned reflect the "relative importance [that] has been attributed to the income statement in recent years." Comptroller's Appraisal at 7. As the district court correctly noted, this reasoning "properly favored the anticipated earnings of the bank over the adjusted value of its assets." XI R. (Pleadings) Doc. 245, at 10 (footnote omitted). The Comptroller has articulated rational explanations for the decisions made and has further explained why the recommendations of plaintiffs' expert were rejected. See Comptroller's Appraisal at 5-6. We will inquire no further.
 
 
 44
 We also reject plaintiffs' argument that the price paid for their stock should have been the same as the price paid for the Controlling Shareholders' stock. As noted in Beerly, "federal law contains no such requirement," and such an argument fails to appreciate the "big difference between the value of a minority shareholder's interest and the value of a controlling interest." Id. at 946-47. Thus, we affirm the district court's § 215 rulings.[6]
 
 B. RICO
 
 45
 The district court also granted the defendants' motion to dismiss plaintiffs' claims pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-65 (RICO). Plaintiffs had conceded that their RICO claims in the second amended complaint were inadequate under Fed.R.Civ.P. 12(b)(6) but sought leave to amend to cure the defect. The district court, however, determined that both the second and third amended complaints failed to satisfy the dictates of our decision in Torwest DBC, Inc. v. Dick, 810 F.2d 925 (10th Cir.1987). In Torwest, this court held that RICO's "pattern" requirement is not satisfied by "an isolated incident." Id. at 929.[7] Applying Torwest to the instant case, the district court held that the plaintiffs "do not allege a threat of continuing activity by the defendants." III R. (Pleadings) Doc. 118, at 11.
 
 
 46
 Since our decision in Torwest, however, the Supreme Court has held that plaintiffs need not allege more than one scheme to satisfy the "pattern" element of a RICO claim. See H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); Phelps v. Wichita-Eagle Beacon, 886 F.2d 1262, 1273 (10th Cir.1989). Even so, we will affirm the district court's conclusion that plaintiffs have failed to state a claim on which relief may be granted, though its reasoning may be presently untenable. See, e.g., Phelps at 1273-74 (affirming RICO dismissal despite district court's reliance on multischeme reasoning).
 
 
 47
 To satisfy the pattern requirement of RICO, plaintiffs must show two elements--"continuity plus relationship." Sedima, 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14. The relationship test "is not a cumbersome one for a RICO plaintiff. A showing that predicate acts 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events' is essentially all that is needed." Feinstein v. RTC, 942 F.2d 34, 44 (1st Cir.1991) (quoting H.J. Inc.). But the continuity requirement is more difficult to meet:
 
 
 48
 The central question is whether [defendants' activities] are "continuous." To establish continuity, the plaintiff must demonstrate either "a closed period of repeated conduct" or "past conduct that by its nature projects into the future with a threat of repetition." ... These two forms of continuity are respectively referred to as closed-ended and open-ended continuity.
 
 
 49
 Phelps, 886 F.2d at 1273 (citing H.J. Inc.). Although we believe that plaintiffs' pleadings satisfy the relationship test, we hold as a matter of law that plaintiffs' Third Amended Complaint fails to satisfy the continuity requirement. Accordingly dismissal of the RICO claim was proper.
 
 
 50
 The facts as pled, inter alia, accuse the defendants of concerting to defraud CNB's minority stockholders of their stocks' value by engineering a merger between CNB and New Bank, thereby forcing the surrender of valuable CNB stock for heavily leveraged Holding Company stock. The duration of this scheme extends from the April 1985 negotiations between the Controlling Shareholders, the Bouchiers, and possibly MBank, and culminates 90 days after the April 21, 1986, merger when plaintiffs were forced to undergo Comptroller valuation of their surrendered stock following the defendants' obstruction of a committee appraisal.
 
 
 51
 As predicate acts to accomplish this scheme, defendants are accused in the proposed Third Amended Complaint of: forming the Holding Company and New Bank and arranging through secret negotiations for the assumption of the Bouchiers' liabilities by the Holding Company, III R. (Pleadings) Doc. 96, at p 21, p 41(a); approving the merger for their own benefit, p 42(d); pressuring plaintiffs to accept an inadequate $35 per share offer by threatening resort to a Comptroller appraisal, p 37; cancelling the dissenters' surrendered shares before they were appraised, p 31; and obstructing the committee appraisal, p 36.
 
 
 52
 These facts, allegedly including "schemes and episodes over 23 months ... and threatening to continue hereafter," id. at p 41, involve a common scheme executed against common victims for a single goal. Thus, plaintiffs have satisfied the relationship test. They do not, however, satisfy the H.J. Inc. test of continuity:
 
 
 53
 A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the threat of continuity is demonstrated. See S.Rep. No. 91-617, at 158.
 
 
 54
 492 U.S. at 252, 109 S.Ct. at 2907 (emphasis in original).
 
 
 55
 Under certain circumstances, such a period of repeated criminal activity may be sufficient to constitute a "substantial period of time" as envisioned in H.J. Inc. However, we need not decide whether the period of activity alleged here is a "substantial period of time" because we hold that the facts as alleged fail to show any threat of "future criminal conduct." Plaintiffs allege what is actually a closed-ended series of predicate acts constituting a single scheme (the transfer of debt) to accomplish a discrete goal (the merger) directed at a finite group of individuals (CNB shareholders) "with no potential to extend to other persons or entities." Sil-Flo, Inc. v. SFHC, Inc., 917 F.2d 1507, 1516 (10th Cir.1990). Thus plaintiffs have not alleged the type of activity that RICO was enacted to address. See id. (noting Congress' concern with long-term criminal activity). The dismissal of the RICO claims and the rejection of the Third Amended Complaint were not in error.[8]
 
 C. The Alleged Securities Violations
 
 56
 The district court granted summary judgment for all the defendants (except MBank) on plaintiffs' alleged violations of § 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934.[9] These claims focus on alleged material misrepresentations and omissions from a prospectus and proxy statement dated February 14, 1986, which defendants mailed to all CNB shareholders before the merger vote.
 
 
 57
 As noted by the district court, plaintiffs' amended complaint enumerates twenty-nine allegations of misrepresentation and omission pertaining to the proxy statement. See XI R. (Pleadings) Doc. 245, at 15. Respecting the numerous averments, the court held that plaintiffs "failed to demonstrate the causation element of a claim under section 10(b) and Rule 10b-5" because they could not show "loss causation,"--that the misrepresentations and omissions caused the economic injuries plaintiffs allegedly suffered. Id. at 17-18.[10]
 
 
 58
 Since the district court's opinion, however, the Supreme Court has spoken more directly to the issue of causation for implicit causes of action like the one presented here. In Virginia Bancshares, Inc. v. Sandberg, --- U.S. ----, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991), a majority stockholder "froze out" the minority stockholders by way of a merger. Under Virginia law, the approval of the minority voting shares was unnecessary for the merger. Certain minority stockholders brought a securities action pursuant to § 14(a) of the 1934 Act, complaining that the proxy statement describing the merger contained material misstatements and omissions. The Fourth Circuit subsequently affirmed a judgment in favor of the plaintiffs on various causation theories.
 
 
 59
 In reversing, the Supreme Court cautioned that in cases involving implied rights of action, courts must ensure that "the breadth of the right once recognized should not, as a general matter, grow beyond the scope congressionally intended." Id. --- U.S. at ----, 111 S.Ct. at 2763. In the absence of " 'conclusive guidance' from Congress" on the scope of the implied right, the Court stated that the policy concerns expressed in Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), should control. There, the Court expressed concerns about "the practical consequences of allowing recovery, under § 10(b) of the Act and Rule 10b-5, on evidence of what a merely hypothetical buyer or seller might have done on a set of facts that never occurred." --- U.S. at ----, 111 S.Ct. at 2765.
 
 
 60
 Accordingly, Virginia Bancshares expressed reluctance to recognize "speculative claims" where liability "would turn on 'hazy' issues inviting self-serving testimony, strike suits, and protracted discovery, with little chance of reasonable resolution by pretrial process." Id. --- U.S. at ----, 111 S.Ct. at 2765 (citing Blue Chip Stamps 421 U.S. at 742-43, 95 S.Ct. at 1929). The Court generally rejected theories of causation presented by shareholders whose participation was not needed for corporate action, see id. --- U.S. at ---- n. 12, 111 S.Ct. at 2765 n. 12, and held that in most instances where the votes of majority shareholders were sufficient to effect a merger without minority approval, a minority shareholder could not prove causation under § 14(a), despite the receipt of a misleading proxy statement. See id. --- U.S. at ----, 111 S.Ct. at 2762-66.
 
 
 61
 Although Virginia Bancshares addressed only § 14(a) claims, the opinion extensively relied on Blue Chip Stamps, a § 10(b) case. After reviewing both cases, we are persuaded that the reasoning of Virginia Bancshares applies to § 10(b) claims in connection with mergers like the reverse triangular one at bar. See Scattergood v. Perelman, 945 F.2d 618, 625 (3rd Cir.1991) (applying Virginia Bancshares to a § 10(b) claim).
 
 
 62
 Applying Virginia Bancshares here, we uphold the district court's conclusion that plaintiffs are unable to satisfy the causation requirement for their § 10(b) and Rule 10b-5 claims. Plaintiffs concede that the defendants controlled approximately 71% of CNB's voting stock, well in excess of the two-thirds needed to approve the merger without the minority shareholders' proxies. Although plaintiffs insist that "principles of corporate law applicable to management buyouts" require that the self-dealing defendants prove the "entire fairness" of the merger, Opening Brief at 32-25, the Court in Virginia Bancshares imposed no such requirement on the defendants. We find no reason to do so here, and we reject any theory of causation plaintiffs present based solely on allegations of a breach of corporate fiduciary duty under state law. See, e.g., Santa Fe Indus. Inc. v. Green, 430 U.S. 462, 479, 97 S.Ct. 1292, 1304, 51 L.Ed.2d 480 (1977) ("[a]bsent a clear indication of congressional intent, we are reluctant to federalize the substantial portion of the law of corporations that deal with transactions in securities").
 
 
 63
 Plaintiffs, however, also argue that the omissions and misrepresentations by the defendants caused them to delay seeking a state court injunction of the merger. In Virginia Bancshares, the Court reserved its decision on whether " § 14(a) provides a cause of action for lost state remedies." Id. --- U.S. at ----, 111 S.Ct. at 2766. But see Healey v. Catalyst Recovery of Pennsylvania, Inc., 616 F.2d 641, 645-47 (3d Cir.1980) (holding that a cause of action under Rule 10b-5 exists if a misrepresentation or omission by the defendant prevents the plaintiff from enjoining the merger). Here, however, the district court observed that "plaintiffs failed to identify any evidence in the record that supports this claim." XI R. (Pleadings) Doc. 245, at 16. None of the plaintiffs entered statements in the record reflecting that they would have tried to enjoin the merger had they known of specific information which was withheld or obscured by the defendants.[11] Even so, for purposes of summary judgment, the court "assume[d] that plaintiffs have produced evidence that they would have sought an injunction to block the merger if the Proxy Statement had not contained omissions." Id. at n. 8. The court then went on to hold, however, that the misrepresentations and omissions were not "material" under Northway.
 
 
 64
 We believe the district court was overly generous in assuming that plaintiffs had produced sufficient evidence to support an allegation of a lost state remedy in the face of a summary judgment motion. Thus, we will affirm on the narrow ground that plaintiffs have not presented evidentiary materials sufficient to establish a factual issue on causation stemming from an allegedly lost state remedy.[12]
 
 
 65
 We recognize that reasonable inferences favorable to the nonmovants must be drawn on a summary judgment motion. Nevertheless, courts are not required to "assume that plaintiffs have produced evidence" necessary to rebut a motion for summary judgment. See Anderson v. Liberty Lobby, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party"). Indeed, to do so undermines the main purpose of the summary judgment mechanism. See Catrett, 477 U.S. at 323-24, 106 S.Ct. at 2553 ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses"). Thus, in response to defendants' motion for summary judgment, plaintiffs must demonstrate more than a mere possibility that a state remedy was lost.
 
 
 66
 As the district court noted, the strongest evidence presented on this issue was plaintiff Zora Evans' sworn declaration that without the omissions, "I might have been very interested in trying to stop the holding company and let the bank remain as it was." Deposition of Zora Evans at 188 (emphasis added). We do not believe this qualified assertion of "interest" in stopping the holding company is sufficient to show that plaintiffs would have tried to enjoin the merger had they learned of any information that the defendants allegedly kept from them. After two years of pretrial litigation, plaintiffs did not produce an affidavit or deposition declaring that had they known the truth, they would have tried to block this merger.
 
 
 67
 Plaintiffs were apprised several times throughout the proxy statement that the merger terms drafted by CNB's management "are not the result of arm's-length negotiations[,]" specifically, because "there exist direct conflicts of interest in the negotiation and approval of the Merger by the officers and directors of the Bank and the Corporation." Proxy Statement at 12, Attach. to Renfrow Aff. (emphasis added). The proxy statement also made clear that the merger involved certain inequities and uncertainties and that management believed the dissenters' remedy lay in the appraisal rights of § 215. See id. at 10, 13, 15, 22 (noting negotiations not at arms' length; minority and majority benefits might not be substantial equivalents; no guarantee that bank earnings could cover assumed debt service). Moreover, plaintiffs were told that the "immediate benefit from the transaction" would accrue to the defendants, "which may result in substantial financial risks to the Bank and the Minority Shareholders." Id. at 12.
 
 
 68
 The plaintiffs did not seek to enjoin the merger although the proxy statement contains several references to the financial jeopardy attaching to minority shares after the merger and states that minority shareholders would have no say in future management decisions. Thus it would be mere speculation to assume that plaintiffs would have sought an injunction. Despite repeated amendments to their complaint and the taking of numerous depositions, plaintiffs failed to affirmatively declare that certain withheld or misstated information would (or even probably would) have caused them to seek a state court injunction. Nonetheless, plaintiffs ask us to infer causation because they lost a state remedy.
 
 
 69
 Under these circumstances, the reasoning of Virginia Bancshares convinces us to refrain from recognizing this "speculative claim," id. --- U.S. at ----, 111 S.Ct. at 2765, and we hold that plaintiffs have failed to satisfy their burden of presenting "affirmative evidence in order to defeat a properly supported motion for summary judgment." Liberty Lobby, 477 U.S. at 256, 106 S.Ct. at 2514.
 
 D. MBank's Liability
 
 70
 In ruling on MBank's motion to dismiss or alternatively for summary judgment, the district court held that MBank was entitled to summary judgment because the plaintiffs had conceded that MBank was only secondarily liable for any alleged breach of federal securities laws by the other defendants. Having granted summary judgment in favor of all of the other defendants, the court held that MBank can only be liable insofar as the other defendants were liable. As a result, the court granted summary judgment in favor of MBank. See XI R. (Pleadings) Doc. 245, at 22-23.
 
 
 71
 On appeal, plaintiffs allege that MBank is secondarily liable under Rule 10b-5 as an aider and abettor and as a coconspirator with the other defendants. However, we adopt the reasoning of the district court and hold that MBank was entitled to summary judgment because its liability under federal law is contingent on that of the other defendants. For reasons already expressed, we have found the judgments in favor of the other defendants to be proper.
 
 
 72
 Plaintiffs also argue that MBank is directly liable under state law fiduciary duty principles as a "Controlling Person" following the Bouchiers' default on the secured notes held by the bank. The district court did not reach this issue because it dismissed plaintiffs' state law claims without prejudice. Although plaintiffs' state and federal claims derived from a "common nucleus of operative facts," United Mine Workers of America v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966), the district court declined to exercise its discretion to retain pendent jurisdiction over plaintiffs' remaining state law claims, and we find no abuse of discretion in that ruling.
 
 IV
 CONCLUSION
 
 73
 No reversible error has been demonstrated and the orders appealed herein are
 
 
 74
 AFFIRMED.
 
 
 
 *
 The Honorable Lewis T. Babcock, United States District Judge for the District of Colorado, sitting by designation
 
 
 *
 * Subsequent to argument and submission, Judge Holloway took senior status effective May 31, 1992
 
 
 [1]
 During the pendency of this appeal, some of the plaintiffs initiated a separate lawsuit against MBank, challenging the merger in state court. Following MBank's insolvency, the Federal Deposit Insurance Corporation (FDIC), as receiver, was substituted as a defendant and removed the case to the federal district court under the number 89-0496SC. Appended to their opening brief on this appeal, plaintiffs have filed the first amended complaint in the removed case, which is now before the district court, offering it as a supplemental statement of facts. We will not review this complaint, however, because it was not before the district court when the various rulings at issue were made
 On March 28, 1989, the Office of the Comptroller of the Currency (OCC) issued a Declaration of Insolvency and Appointment of Receiver, appointing the FDIC as receiver for MBank. In the instant appeal, the FDIC, in its capacity as MBank's receiver, was substituted for MBank as a defendant by our order of June 28, 1989. For clarity, however, we will still refer to MBank as the defendant.
 
 
 [2]
 In a reverse triangular merger, the principals of an existing bank (original bank) establish a bank holding company (BHC). The principals then apply for authority to charter an interim bank which will be wholly owned by the BHC. The directors of the original bank and the interim bank then agree to merge the two banks after government regulatory approval. In a triangular merger, the interim bank becomes the surviving bank; in a reverse triangular merger, the original bank is the survivor. In both instances, the surviving bank is wholly owned by the BHC and the shareholders of the original bank are required to exchange their original bank shares for shares in the BHC
 
 
 [3]
 Section 215 provides in relevant part that:
 (a) Approval of Comptroller, board and shareholders;
 Any national banking association or any bank incorporated under the laws of any State may, with the approval of the Comptroller, be consolidated with one or more national banking associations located in the same State under the charter of a national banking association on such terms and conditions as may be lawfully agreed upon by a majority of the board of directors ... and be ratified and confirmed by the affirmative vote of the shareholders of each such association or bank owning at least two thirds of its capital stock outstanding....
 (b) ... [D]issenting shareholders
 ... [A]ny shareholder ... who has voted against such consolidation ... shall be entitled to receive the value of the shares so held by him when such consolidation is approved by the Comptroller upon written request ... accompanied by the surrender of his stock certificates.
 (c) Valuation of shares
 The value of the shares of any dissenting shareholder shall be ascertained, as of the effective date of the consolidation, by an appraisal made by a committee of three persons.... If the value so fixed shall not be satisfactory to any dissenting shareholder ... that shareholder may ... appeal to the Comptroller, who shall cause a reappraisal to be made which shall be final and binding as to the value of the shares of the appellant.
 (d) Appraisal by Comptroller ...;
 If, within ninety days from the date of consummation of the consolidation, for any reason one or more of the appraisers is not selected as herein provided, or the appraisers fail to determine the value of such shares, the Comptroller shall upon written request of any interested party cause an appraisal to be made which shall be final and binding on all parties.
 
 
 [4]
 The Delaware Block Method of appraisal requires the consideration and weighing of four factors which are treated as independent "blocks": book value, adjusted book value, market value, and investment value. See Keeffe, 808 F.2d at 248; Northern Acceptance Trust 1065 v. Amfac, Inc., 59 F.R.D. 116, 125 (D.Haw.1973)
 
 
 [5]
 Although plaintiffs allege that the Comptroller inconsistently applied this and other "market standards" to the peer banks' share data, they presented nothing in opposition to the Comptroller's motion which indicates that the appraisal would have been different using these "standards" or showing that the market for the peer banks' stock was equally undependable
 
 
 [6]
 Because the district court properly granted summary judgment to the Comptroller, there can be no error in granting summary judgment to the Holding Company and CNB for the same reasons
 We also note that plaintiffs raise a constitutional challenge to the Comptroller's statutory appraisal procedure under the Fifth Amendment's Due Process Clause. However, we do not decide the merits of this claim because the arguments on this complex issue were first spelled out by appellants in their reply brief. See United States v. Jenkins, 904 F.2d 549, 554 n. 3 (10th Cir.1990). Plaintiffs' mere mention of an undefined constitutional claim in heading III of their opening brief, without supporting argument or authorities, is insufficient to avoid this rule. However, were we to address this issue, we would still reject it. Plaintiffs challenge the constitutionality of the OCC's approval of bank mergers "[w]ithout an adjudicatory proceeding in which dissenters fully participate." Reply Brief at 5. However, we believe, as in Beerly, that plaintiffs "ha[ve] not shown how the use of these expensive and time consuming procedures would have reduced" the risk of error by the OCC in approving the merger pursuant to § 215(a). Beerly, 768 F.2d at 948-49.
 
 
 [7]
 To state a claim under RICO's § 1962(c), plaintiffs must allege four statutory elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985)
 
 
 [8]
 The district court noted that the RICO claim was the only basis asserted for plaintiffs' request to amend their amended complaint. Because the plaintiffs' proposed amendment fails to allege a claim upon which relief may be granted, there can be no error in the district court's denial of leave to amend
 
 
 [9]
 The court also granted summary judgment for defendants on claims brought pursuant to § 17(a) of the Securities Act of 1933 and § 14(a) and Rule 14a-9 of the Securities Exchange Act of 1934. Plaintiffs do not appeal these rulings. See Opening Brief at 3
 
 
 [10]
 As an alternative basis for its decision, the court held that any alleged misrepresentations and omissions were not "material" within the meaning of TSC Indus., Inc. v. Northway, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). See XI R.Doc. 245, at 14-16. Because we affirm the court on the basis of plaintiffs' inability to satisfy the causation requirement, we express no opinion on this alternative ground
 
 
 [11]
 Plaintiffs' response to the motion for summary judgment declares: "Both Dow (Ex. B, pp. 113-4, 209-214) and Evans (p. 188) testified that they would have sued had they known the truth, and Boone has given similar testimony." V R. (Pleadings) Doc. 194, at 16. This is incorrect. Reference to the cited pages shows that plaintiff Dow, an attorney, when asked about enjoining the merger, stated only that "Had I had information, I possibly would have done something." Other than the statement of plaintiff Evans, discussed infra in text, we have found nothing of record to support the assertion in plaintiffs' response brief
 
 
 [12]
 Because plaintiffs have not asserted that they would have sought an injunction had certain disclosures been made, we need not reach the question, also reserved in Virginia Bancshares, whether a cause of action for lost state remedies lies here