**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 28 1999**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

BETTY ANNETTE WATKINS,

    Defendant-Appellant.

No. 97-3216
(D.C. No. 96-40061-01-RDR)
(D. Kan.)

**ORDER AND JUDGMENT**[*]

Before **BRORBY**, **McKAY**, and **EBEL**, Circuit Judges.

In January 1997, following a jury trial, defendant-appellant Betty Annette
Watkins ("Watkins") was convicted of federal drug conspiracy and possession
offenses in the United States District Court for the District of Kansas, and was
sentenced to 270 months' imprisonment. She now appeals her conviction and
sentence. We have reviewed Watkins' arguments, and for the reasons set forth
below, we AFFIRM.

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. This court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

# FACTS

Ms. Watkins' case is part of a trio of related criminal appeals decided today involving the same cast of characters in a crack cocaine drug trafficking operation in eastern Kansas. See companion cases United States v. Quary, No. 97-3213; and United States v. Smith, No. 97-3266. Betty Watkins was the sole defendant indicted in this case; eight additional defendants were named in a separate, 82-count indictment. The evidence at Watkins' trial was as follows:

In May 1994, the DEA was asked to assist local law enforcement officers to investigate suspected crack cocaine distribution in Miami, Franklin, and Lyons counties in Kansas. DEA Agent Tom Walsh worked undercover with local police and confidential informants to make purchases of crack cocaine from Lori Smith, Lester Smith, Lexie Lee Smith, Bernard Preston, Elinor Preston (Bernard Preston's sister), Eddie Merritt, and Demond Bridges. Lexie Smith and Bernard Preston were cousins; the entire group allegedly worked for another of Bernard Preston's cousins, James Wardel Quary. All of these individuals were ultimately indicted on drug charges, and all but Quary eventually pled guilty. Betty Watkins was connected to the group through her daughter, Renee Watkins, who dated in succession Bernard Preston, Bridges, and Quary, and who had children by the latter two. Quary and Renee lived with Watkins for awhile from the end of 1993, when Quary was released from prison on prior drug trafficking charges,

until the beginning of 1994, when he and Renee moved to an apartment leased by Watkins.[1]

Bernard Preston became the government's chief witness at Watkins' trial, and testified pursuant to a plea agreement. According to Preston, Watkins sold crack cocaine out of her house in Ottawa, Kansas, to a steady stream of customers, and she obtained her drug supply from Quary. Preston testified that Watkins, who is white, would drive Quary to Kansas City on buying trips, reasoning that police would be less likely to bother a white driver. Preston stated that he went on these trips with Quary and Watkins three or four times, and that he and Quary occasionally went without Watkins.

Local law enforcement officers Timothy Woods and Tim Cronin participated in the investigation. Woods testified at trial that on May 8, 1996, the two officers met with a confidential informant, who told them Watkins was selling crack, and set up a controlled purchase at Watkins' house. Based on this purchase, the officers obtained a search warrant for the house. When the warrant was executed shortly thereafter, officers discovered Watkins at the kitchen sink with a jar containing small packages of crack. They found additional packages of crack, a safety razor, and a large chunk of crack in the sink. Officers seized a

---

[1] When Renee later moved out of the apartment, Preston and Bridges moved in with Quary.

total of 16.97 grams of crack cocaine, the confidential informant's buy money, $2,153 in cash, two checkbooks, and an address book.  One of the checkbooks was in Watkins' name but listed the apartment address where Renee and Quary lived.  The address book contained phone numbers for "Bern" (a nickname for Bernard Preston) and "Demo" (a nickname for Demond Bridges).

The only person in the house besides Ms. Watkins at the time officers executed the search warrant was Watkins' four-year-old grandson.  After being read her Miranda rights, Watkins agreed to talk to Officer Cronin upon his promise not to send the grandchild to a foster agency.   She then admitted to Cronin that the contents of the sink belonged to her.

Watkins was subsequently taken to the local jail, where she was read her Miranda rights a second time and was interviewed again, this time by Cronin and DEA Agent Thomas Walsh.   Cronin tape-recorded this interview, which lasted for two hours.  During the interview, Watkins apparently admitted that she had sold crack cocaine since 1994, but she refused to identify her supplier.  She also apparently admitted that Bernard Preston, Demond Bridges and Demetrius Clay had started her off and taught her how to sell drugs, but she stated that she made her trips to purchase drug supplies by herself, and she adamantly denied that she was involved with Quary in this enterprise and insisted that Quary had nothing to do with drugs.

After the interview, Cronin gave the tape to Walsh. Cronin never saw the tape again and did not know what Walsh did with it. Three days after the interview, Walsh condensed what he believed was "significant" from the two-hour taped interview into two paragraphs of a written report. He forwarded a draft to Cronin, who made corrections to it based on his memory of what Watkins had said. Walsh then drafted a final report, and destroyed the tape. Although the written report was disclosed to the defense, it was never introduced into evidence at trial; the only evidence before the jury regarding the content of the recorded interview came from the testimony of Agent Walsh and Officer Cronin.

Defense counsel first learned of the existence of the tape on the second day of trial, during cross-examination of Officer Cronin. Counsel first learned that Agent Walsh had destroyed the tape on the third day of trial, during the government's direct examination of Walsh. Walsh testified that he destroyed the tape in accordance with DEA policy, which, according to him, vests individual agents with the discretion to preserve or destroy a tape once it is reduced to a report. He stated that he did not consider the tape to be evidence, but rather, "original notes," which properly could be destroyed, such as in this case, where he testified that he felt "[t]here was nothing significant on the tape that couldn't be reduced to a written report." Although Walsh stated that it was not unusual for him to destroy tapes of interviews, he also stated that he did not, as a matter of

simple routine, always destroy tapes. He conceded, for example, that he would have preserved the tape of Watkins' interview if Watkins had "confessed," if she had made "a statement concerning significant events by identifying traffickers or sources of supply," or if she had incriminated Quary. Although Walsh conceded that Watkins denied during the interview that Quary was involved in drug trafficking, and that Watkins insisted that she travelled solo to Kansas City to buy crack, Walsh testified that he disbelieved her.

At the close of evidence, defense counsel moved for dismissal of the case based on Agent Walsh's intentional destruction of the tape of Watkins' post-arrest interview. Counsel argued in the alternative that if the court did not dismiss the case, it should either suppress the agent's testimony about Watkins' statements, or at least instruct the jury that it could draw an adverse inference from the destruction of the tape. The court denied defense counsel's motion summarily, and made no findings as to the potential exculpatory value of the tape or as to whether Agent Walsh acted in bad faith. The court later also denied defense counsel's request for an adverse inference instruction.

The jury convicted Watkins on both counts charged in the indictment, namely, conspiring with James Quary and others to possess with intent to distribute 50 grams or more of cocaine base, in violation of 21 U.S.C. § 846 (Count 1), and possessing with intent to distribute 16.97 grams of cocaine base, in

violation of 21 U.S.C. § 841(a)(1) (Count 2). Watkins was sentenced on each count to 270 months' imprisonment, with the sentences to run concurrently. Her base offense level of 38 for each count was established based on her possession of the 16.97 grams of crack cocaine, as well as an estimated 7.2 kilograms of crack distributed over the duration of the conspiracy.

On appeal, Watkins alleges several errors: 1) the government intentionally destroyed the tape of Watkins' post-arrest interview, violating Watkins' due process rights; 2) the prosecution improperly elicited testimony about the contents of documents that the court had previously ruled inadmissible; 3) the district court admitted hearsay evidence in violation of Watkins' right of confrontation; 4) the government improperly induced witness testimony through promises of leniency; and 5) cumulative error.

## DISCUSSION

A. Government's Intentional Destruction of Exculpatory Evidence

Watkins contends that the government's intentional destruction of the tape recording of her post-arrest exculpatory statements violated her due process rights and warranted sanctions under the principles articulated in California v.

Trombetta, 467 U.S. 479 (1984), and Arizona v. Youngblood, 488 U.S. 51

(1988).[2]

We review a district court's conclusion that the government did not destroy

potentially exculpatory evidence for clear error. See United States v. Parker, 72

F.3d 1444, 1451 (10th Cir. 1995); United States v. Bohl, 25 F.3d 904, 909 (10th

Cir. 1994).

In Trombetta, the Supreme Court held that the government has a duty to

preserve "evidence that might be expected to play a significant role in the

suspect's defense." Trombetta, 467 U.S. at 488. Thus, the government violates a

criminal defendant's due process rights when it destroys constitutionally material

evidence – that is, where (1) the evidence in question possesses an exculpatory

---

[2]The parties agree that if Agent Walsh had not destroyed the tape, Watkins would have been entitled to the recording under Fed. R. Crim. P. 16(a), which provides in part:

**(a) Governmental Disclosure of Evidence.**

**(1) Information Subject to Disclosure.**

**(A) Statement of Defendant.** Upon request of a defendant the government must disclose to the defendant and make available for inspection, copying, or photographing: any relevant written or recorded statements made by the defendant, or copies thereof, within the possession, custody, or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government.

significance that was apparent before its destruction; and where (2) the defendant is unable to obtain comparable evidence by other reasonably available means. See id. at 489. In Youngblood, the Court elaborated upon Trombetta, holding that where the evidence is only "potentially useful" to the defendant, the destruction of such evidence does not violate due process absent a showing of bad faith on the part of law enforcement. See Youngblood, 488 U.S. at 58.

We find that the government's destruction of the tape in this case violated neither Trombetta nor Youngblood.

### 1. No *Trombetta* violation

We find that although Watkins has met the first prong of Trombetta (that the exculpatory nature of the destroyed evidence was apparent), she has failed to meet the second prong of that test (that the evidence was of such a nature that other comparable evidence was not reasonably available). As such, she has failed to establish a Trombetta violation.

Watkins concedes that her post-arrest statements admitted her possession of the 16.79 grams of crack cocaine discovered at her residence when police executed the search warrant; thus, the potentially exculpatory nature of her post-arrest statements is limited to the denial of her involvement in a conspiracy with Quary or others.

We find that the exculpatory significance of Watkins' recorded statements should have been apparent to a reasonable law enforcement officer. Walsh's own testimony at trial revealed that Watkins denied Quary's involvement in drug trafficking, and that after having been taught the trade by Bernard Preston, Demond Bridges, and Demetrius Clay, she essentially operated on her own, traveling alone to Kansas City, for example, to purchase crack cocaine. Taken at face value, these statements were exculpatory as to any charge of conspiracy, regardless of Agent Walsh's subjective belief as to their veracity. Walsh's personal belief that the statements were falsely exculpatory is irrelevant under Trombetta. Walsh had a duty to preserve such evidence; it was the province of the jury to weigh the credibility of the exculpatory statements, not the agent's. Given that Walsh was trying at the time to gather evidence of a drug conspiracy among Quary and others, we cannot say that the exculpatory significance of Watkins' statements – at least with respect to her involvement in such a conspiracy – was not apparent.

However, Watkins nonetheless fails to show a Trombetta violation because she has failed to show that the statements were of such a nature that other comparable evidence was not reasonably available.

The exculpatory evidence Watkins sought to have introduced was her denial of any involvement in a drug conspiracy with Quary or others. This evidence was

not only otherwise available but in fact came into evidence through the testimony of the law enforcement officers. Agent Walsh testified that Watkins denied such involvement. Certainly the tape would have been a more accurate reconstruction of the conversation, but Trombetta requires only that "comparable" evidence -- not exact evidence -- have been reasonably available.

If there was other exculpatory material on the tape (besides Watkins' denial of her involvement in the conspiracy), it is her burden to establish what that was, or least to make a detailed offer of proof as to what it was. She was present at the tape recording of her conversation, and it is not unreasonable to place that burden on her as the movant for sanctions. She has not shown that additional exculpatory material existed on the tape, and her mere speculation is no proof that such exculpatory material existed, let alone "obviously exculpatory" material.

In any event, even if there was a Trombetta violation, it was harmless. First, the value of the exculpatory evidence on the tape was slight at best. A defendant's denial of criminal culpability is inherently suspect; Watkins' recorded statements could be expected to have carried little weight with the jury. Second, the tape recording would have been largely redundant. The jury heard from the officers who interviewed her what her exculpatory statements were. The only thing the tape might have added was her tone of voice in her responses to their questions. However, she presents no offer of proof that her tone was particularly

compelling or uniquely exculpatory.   Third, even if the taped statements were strongly exculpatory, Watkins had the ability to take the stand and repeat the testimony.  She was present at the taping, and so she could, if she thought this evidence was critical, have taken the stand to repeat what she had told the officers.  Presumably the officers would have corroborated what she said, or at least, nothing in the record shows that they would have refuted her statements.  Fourth, it is doubtful that this evidence was admissible in any event because it would have been hearsay.  Watkins submits that the exculpatory portions of the tape would have been admissible under the rule of completeness if the government had introduced the inculpatory portions of the tape.  See Fed. R. Evid. 106.  However, she has not made any showing that the government would have introduced the inculpatory portion of the tape even if it could.  Finally, upon review of the record, we are convinced that the evidence at trial of Watkins' guilt was so strong that any exculpatory value of the tape would be insignificant and would not have affected the result.

2. No *Youngblood* violation

Watkins cannot show that the government's destruction of the tape violated Youngblood because she cannot show, on this record, that the tape was destroyed in bad faith.  Agent Walsh testified that he destroyed the tape in good faith under

discretion he believed he had under DEA policy,[3] given that he disbelieved Watkins' statements regarding Quary's involvement in drug trafficking. On the record before us, then, Watkins has not offered any evidence that the tape was destroyed in bad faith.

---

[3] We note that defense counsel has moved this court to take judicial notice of the DEA's Policy Manual, of which counsel obtained a copy for the first time after oral argument before this court. According to the excerpts of the manual that defense counsel attached to the motion, it appears that DEA policy in fact does <u>not</u> grant agents such discretion. Section 6211.6 provides in part:

> A. Rough notes taken by an Agent while interviewing a potential Government witness, an informant, a suspect, or a subject of an investigation are subject to discovery. Failure to produce these notes, even due to good faith loss or destruction, could result in dismissal of the case. Agents will therefore preserve any such notes, even though their contents have been subsequently reported on DEA Form 6.
> B. The term "notes" includes handwritten notes, <u>original tapes</u>, or other work papers made during the interview of a potential Government witness, or any such documents made outside the interview from which the witness was directly questioned. Original tapes will be handled as nondrug evidence.

(Emphasis added.)

Thus, although the manual casts doubt on Agent Walsh's testimony, it was not part of the record before the district court, and therefore we may not consider it on appeal. See Boone v. Carlsbad Bancorporation, Inc., 972 F.2d 1545, 1549 n.1 (10th Cir. 1992); see also United States v. Judge, 846 F.2d 274, 276 (5th Cir. 1988) (declining to take judicial notice of DEA regulations where they were not part of the lower court record). We therefore deny what is essentially a motion to expand the record. However, we assume that DEA authorities will review Agent Walsh's testimony and take any appropriate steps if they determine that Agent Walsh was not following DEA policy.

B. Other Alleged Errors

Watkins also argues that the admission of several hearsay statements violated her Sixth Amendment right of confrontation. In addition, Watkins contends that the prosecution acted improperly in eliciting testimony from Agent Walsh regarding phone records retrieved from Watkins' trash, after the court had ruled more than once that the records themselves were inadmissible due to the government's untimely production of this evidence. As counsel did not object to this testimony at trial, our review is for plain error only. See Fed. R. Crim. P. 52(b). We have reviewed the record cites for each of the alleged hearsay violations and are convinced that in each instance the statements were offered not for their truth, but to show res gestae. Because there were no objections from counsel, and because the statements were offered for a legitimate, nonhearsay purpose, we find that the district court did not plainly err in admitting these statements. As for Agent Walsh's testimony regarding the telephone records, we find that any error in the admission of these statements was harmless.

We have reviewed Watkins' other allegations of error and find them to be without merit.

Accordingly, we AFFIRM Watkins' conviction and sentence.

ENTERED FOR THE COURT

David M. Ebel
Circuit Judge

- 14 -