Raymond L. **FRIEDLOB**, Receiver of the Alpine Mutual Fund Trust, a Massachusetts Business Trust, and Raymond L. Friedlob, Receiver of the National Municipal Asset Trust, a series fund of the Alpine Mutual Fund Trust, Plaintiffs,

v.

**TRUSTEES OF the ALPINE MUTUAL FUND TRUST**, a Massachusetts Business Trust; Edwin J. Pittock, individually, as President, Treasurer and as Trustee of the Alpine Mutual Fund Trust; Gilbert W. Acheson, individually and as

844

Trustee of the Alpine Mutual Fund Trust; Paul A. Fregosi, individually and as Trustee of the Alpine Mutual Fund Trust; Larry D. Hayden, individually and as Trustee of the Alpine Mutual Fund Trust; David Kerr, individually and as Trustee of the Alpine Mutual Fund Trust; Robert R. Woodworth, individually and as Trustee of the Alpine Mutual Fund Trust; Alpine Capital Management Corporation, a Colorado corporation and registered investment adviser; Edwin J. Pittock, individually and as President of Alpine Capital Management Corporation; John I. Dickerson, individually and as Chairman of the Board of Directors of Alpine Capital Management Corporation; Thomas F. Leonard, individually and as an officer of Alpine Capital Management Corporation; Alpine Municipal Leasing Corporation, a Colorado corporation; Edwin J. Pittock, individually and as President and a Director of Alpine Municipal Leasing Corporation; John I. Dickerson, individually and as Director of Alpine Municipal Leasing Corporation; and Thomas F. Leonard, individually and as an officer of Alpine Municipal Leasing Corporation; other unnamed John and/or Jane Does, Defendants.

Civ. A. No. 93 N 2337.

United States District Court,
D. Colorado.

May 22, 1995.

Richard H. Goldberg, Raskin & Friedlob, P.C., Denver, CO, for plaintiffs.

Larry D. Hayden, Arvada, CO, pro se.

David M. Tenner, Bond & Morris, P.C., Denver, CO, for defendant Fregosi.

Leonard E. Davies, Denver, CO, for defendant Dickerson.

David A. Zisser, Berliner Kaplan Zisser & Walter, P.C., Denver, CO, for Pittock, Alpine Capital Management Corp., and Alpine Municipal Leasing Corp.

Jeffrey A. Chase, Richard A. Oertli, Holme Roberts & Owen, Denver, CO, for defendants Kerr and Acheson.

Marc J. Musyl, Freeborn & Peters, Denver, CO, for defendant Woodworth.

## ORDER AND MEMORANDUM
## OF DECISION

NOTTINGHAM, District Judge.

This is a securities-fraud case. The litigation arose out of several investments made by three mutual-fund trusts. Plaintiff Raymond L. Friedlob, as court-appointed receiver, brings this action against various individuals and entities involved in the administration and management of the trusts. Plaintiff's allegations of mismanagement are premised on the following claims: (1) violation of sections 11 and 15 of the Securities Act of 1933, 15 U.S.C.A. §§ 77k, 77o (West 1981) [hereinafter the "1933 Act"]; (2) violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C.A. §§ 78j(b), 78t(a) (West 1981) [hereinafter the "1934 Act"], and rule 10b–5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b–5 (1988); (3) violations of sections 8(b), 13(a), 15(c), 17(e) and 21 of the Investment Company Act of 1940, 15 U.S.C.A. §§ 80a–8(b)(1) to –8(b)(3), –13(a)(3), –15(c), –17(e)(2), and –21 (West 1981 & Supp.1995) [hereinafter the "ICA"]; (4) violations of the Racketeer Influenced and Corrupt Organizations Act of 1970, 18 U.S.C.A. § 1962(b)–(d) (West 1984 & Supp.1995) [hereinafter "RICO"]; and (5) state statutory and common-law claims, including securities violations, breach of fiduciary duties, gross negligence, bad faith, willful misfeasance, and reckless conduct.

The matter is now before the court on defendants' (1) motions to dismiss, (2) motions for sanctions, and (3) motions for judgment on the pleadings on the counter-claims for indemnification.[1] Jurisdiction is alleged under the following statutes: (1) 15 U.S.C.A. § 78aa (West 1981 & Supp.1995); (2) 15 U.S.C.A. § 77v (West 1981 & Supp.1995); (3) 18 U.S.C.A. § 1964 (West 1984); (4) 15 U.S.C.A. § 80a–43 (West 1984 & Supp.1995); and (5) 28 U.S.C.A. § 1367 (West 1993).

## FACTS

### 1. Parties

Plaintiff is the court-appointed receiver of three trusts: (1) the Alpine Mutual Fund Trust ("Alpine"); (2) the National Municipal Asset Trust ("NMAT"); and (3) the California Municipal Asset Trust ("CMAT"). (Second Am.Compl. and Jury Demand at 2 [filed July 11, 1994] [hereinafter "Second Am. Compl."].) NMAT and CMAT are sub-trusts of Alpine and were registered as open-end investment companies under the ICA. (*Id.* ¶ 4.) CMAT's primary investment objective was to provide its investors with dividend and interest income exempt from federal and California income tax through investments in municipal leases, including obligations issued by recognized Indian tribal governments. CMAT was to refrain from investing more than 52.5% of the fund's assets without backing from an irrevocable letter of credit. (*Id.* ¶ 24.) NMAT's primary investment objectives were similar to CMAT's. NMAT was to refrain from (1) investing in unrated municipal leases which were not subject to re-marketing agreements and (2) investing more than 10% of its total assets in short-term funds without shareholder approval. (*Id.* ¶ 25.)

Alpine, a Massachusetts business trust, was formed in June 1986 and commenced business on September 19, 1986, under the name Continental Heritage Mutual Fund Trust (the "Continental Trust"). (*Id.*) The Continental Trust was also registered under the ICA. The Alpine Trustees established the NMAT and CMAT sub-trusts (the "Funds") in December 1986, and September 1988, respectively. (*Id.*) Alpine Capital Management Corporation ("Alpine Capital") served as the investment advisor to Alpine from August 24, 1989, to March 1991. (*Id.* ¶ 15.) Alpine Municipal Leasing Corporation ("Alpine Leasing") originated, purchased, and sold securities, including municipal leases, bonds, and other assets, to NMAT and CMAT. (*Id.* ¶ 4.) Defendants Edwin J. Pittock and John I. Dickerson were principal shareholders in Alpine Holding Corporation, the parent corporation for Alpine and Alpine Leasing. (*Id.*) Pittock and Dickerson

---

1. Defendant Leonard has not filed any motions in this case, nor has he joined in any other party's motions. No specific allegations are made against him, however, in the Second Amended Complaint.

served in director and/or officer roles for several entities implicated herein. (*Id.* ¶¶ 8–9, 17.) Plaintiff claims Pittock and Dickerson were "control persons" of Alpine Capital, and that, as investment advisors to Alpine, they are liable because they had ownership, control, and executive positions within the entities responsible for Alpine's bad investments. Plaintiff also states that Pittock and Dickerson had the power to influence the management of Alpine, Alpine Capital, and Alpine Leasing, including the establishment and payment of commissions for the investment decision to purchase and sell the municipal leases at issue in this case and to determine the average daily net asset valuation of CMAT and NMAT. (*Id.* ¶¶ 21, 22.)

Defendants Gilbert W. Acheson, Paul A. Fregosi, Larry D. Hayden, David Kerr, and Robert R. Woodworth served as trustees of Alpine (collectively the "Trustees") during the following time periods:

| | | | |
|---|---|---|---|
| Hayden | June 11, 1986 | – | December 31, 1990 |
| Woodworth | October 20, 1988 | – | August 22, 1989 |
| Kerr | March 15, 1989 | – | November 9, 1990 |
| Acheson | October 31, 1989 | – | October 31, 1990 |
| Fregosi | November 9, 1990 | – | December 5, 1991 |

Plaintiff's claims against these defendants are based on the notion that, as independent trustees, they were "control persons" responsible under the ICA for overall management of the transactions at issue. Thus, plaintiff claims each of the defendants, except Woodworth, is liable for recklessly failing to periodically review the investment advisor's programs, procedures, and portfolio investments to assure they were in conformity with the Funds' fundamental objectives and restrictions. (*Id.* ¶ 33.) Defendants Hayden, Woodworth, and Kerr are also liable, according to plaintiff, because they approved the assignment of a management agreement from Alpine to Alpine Capital on April 18, 1989. (*Id.* ¶ 74.) On June 22, 1989, these defendants submitted the management agreement to Alpine's shareholders for approval, and on July 31, 1989, the shareholders approved the agreement. (*Id.* ¶ 75.) According to plaintiff, liability arises from these actions because defendants breached their duty to request and evaluate pertinent terms of the advisory contract between the Funds and the investment advisor. (*Id.* ¶ 76.) Plaintiff maintains that Fregosi is similarly liable for approving a management agreement on July 26, 1991. (*Id.* ¶¶ 81–84.)

### 2. Transactions

There are essentially five lease transactions and one loan at issue in this case. The following Indian leases are among the improper transactions: (1) the Absentee Shawnee Bandage Group, purchased in part on January 31, 1990, and in part on September 20, 1990; (2) the Kiowa Tribe of Oklahoma, assigned June 15, 1990; (3) the Comanche Enterprise and Investment Authority, Ltd., purchased October 31, 1990; and (4) the Chippewa Cree Development Company, purchased November 8, 1990. (*Id.*, Ex. 1.) The fifth transaction involved in this dispute is the Alpine lease, which Alpine Leasing assigned to NMAT on April 4, 1990. (*Id.*, Ex. 3.) According to plaintiff, each of these transactions involved defendants' improper "investments in municipal obligations, leases and other assets, i.e., securities." (*Id.* ¶ 26.) Plaintiff maintains that defendants authorized a course of dealing with respect to these transactions which was (1) unsuitable, (2) inconsistent with and in violation of the Funds' investment objectives, and (3) inconsistent with and in violation of accepted investment practices. (*Id.*) Although plaintiff's complaint does not establish specific problems associated with the leases, plaintiff states in his response to defendants' motions that the leases were speculative and, therefore, improper because the lessees had demonstrated an inability to pay NMAT. (Pl.'s Combined Resp. in Opp'n to Defs.' Mots. to Dismiss J. on the Pleadings on the Countercls. for Indemnification and for Sanctions Pursuant to Rule 11, Fed.R.Civ.P., and 28 U.S.C. § 1927 at 29 n. 29 [filed Aug. 5, 1994] [hereinafter "Pl.'s Resp."].)

Plaintiff also contends that defendants manipulated CMAT and NMAT into paying excessive commissions on certain municipal leases—a scheme known as "marking up" a security. (*Id.*) It is unclear from plaintiff's complaint precisely how defendants caused the Funds to pay excessive commissions to brokers or to another fund, but a summary list of the commissions is provided. (*Id.*, Ex. 2.) Further, as a result of CMAT

and NMAT paying the excessive commissions, those increased dollar amounts were added to and became a part of "the average daily net asset value of the municipal lease assets of the Funds." (*Id.* ¶ 26.) In turn, Alpine Capital was paid excessive management fees based upon the inflated average daily net value of the Funds' assets. (*Id.*) Plaintiff also maintains that certain of these municipal leases were purchased and sold between the Funds during a short time-period in a manipulative securities scheme known as "flipping." [2] (*Id.*) As a result of the flipping, one fund paid excessive commissions to third parties or to the other fund while adding no real or market value to the investment, thereby constituting a manipulative scheme known as "churning." [3] (*Id.*)

The loan at issue in this case is the "Los Luceros loan," which was a "temporary" loan for $800,000, which Pittock caused NMAT to make on November 7, 1988. (*Id.* at 24.) The apparent problems with the Los Luceros loan were as follows: (1) temporary investments were specifically prohibited under Alpine's prospectus; (2) interest paid on the loan was not tax exempt; (3) the loan and its collateral were not readily marketable due to litigation; (4) the loan was not a municipal lease; (5) defendants caused NMAT to omit or disclose material facts regarding the loan in NMAT's registration statement and in various SEC filings; [4] and (6) the loan deviated from NMAT's investment objective, policies, and restrictions. Plaintiff does not, however, specify the manner of such deviation. (*Id.* at 24–25, ¶¶ 76–77; Pl.'s Resp. at 28 n. 29.)

In addition to the improper leases and the Los Luceros loan, plaintiff maintains that on February 28, 1991, defendants Pittock and Alpine Capital engaged in fraudulent, deceptive, and manipulative conduct by causing NMAT to enter into a service agreement with Lee Watson and FDI, Inc. (*Id.* ¶ 27.) Pursuant to the service agreement, Watson and FDI agreed to perform all servicing obligations with respect to certain "Certificates of Participation" that NMAT entered into with third parties for the purpose of leasing juice vending machines to school districts and/or school systems throughout the United States. (*Id.* ¶ 27a.) In connection with the vending machine leases, FDI executed a promissory note in favor of NMAT on November 1, 1990. (*Id.*) FDI subsequently defaulted on the note. Watson and FDI also failed to perform under the service agreement and to remit proceeds from the juice leases to NMAT. (*Id.*) Although plaintiff's complaint does not specify how or why defendants' actions were fraudulent, deceptive, or manipulative, I have surmised from plaintiff's response that he believes defendants were aware of the lessee's inability to meet its obligations at the time the service agreement was executed. (Pl.'s Resp. at 29 n. 29.) Presumably, the "violation" associated with the service agreement occurred at the time NMAT entered into that agreement.

Lastly, plaintiff alleges that Pittock caused CMAT to make monthly distributions to its shareholders in excess of its earnings without disclosure of this fact to its shareholders during the months of March 1991, and May through October 1991. (Second Am.Compl. ¶ 27b.) In November 1991, the SEC filed an action for injunctive relief against Alpine alleging that improper distributions were made to CMAT shareholders. (Br. in Supp. of Mot. to Dismiss the Second Am.Compl. Filed on Behalf of Defs. Edwin J. Pittock, Alpine Capital Management Corporation, and Alpine

---

2. Flipping refers to a situation where brokers simultaneously recommend to customers the sale of one security and the purchase of another for the purpose of increasing commissions.

3. Churning is excessive trading on an account by a broker in light of the investor's objectives. *O'Connor v. R.F. Lafferty & Co.*, 965 F.2d 893, 898 (10th Cir.1992). To sustain a churning claim, plaintiff must prove: (1) trading in the account is excessive in light of the investor's objectives; (2) the broker exercised control over trading in the account; and (3) the broker acted with an intent to defraud or with willful disregard for the investor's objectives. *Id.*

4. Plaintiff maintains Pittock and Dickerson knew of the misrepresentations and omissions of material facts, or acted with reckless disregard for their truth or falsity, by failing to ascertain and disclose true facts when such facts were ascertainable by or available to them. (Second Am. Compl. ¶ 31.) Additional defendants are liable for the misrepresentations or omissions because they *signed* the documents at issue. (*Id.* ¶ 38.)

Leasing Corp., Ex. A [*SEC v. Alpine Mutual Fund Trust*, No. 91–F–2027 (D.Colo. Nov. 20, 1991) ] [filed July 22, 1994] [hereinafter "Pittock Br."].) The court appointed plaintiff as Alpine's receiver on November 25, 1991. (Pl.'s Resp. ¶ 36.) On January 31, 1992, plaintiff filed his first receiver's report in the SEC action. (Pittock Br., Ex. B.) In that report, plaintiff advised the court that claims against former trustees and advisors were under evaluation, and he identified several investment transactions, including those at issue in this case, which were in default and under review. (*Id.*) Plaintiff commenced this action on November 5, 1993.

## ANALYSIS

### *Defendants' Motions to Dismiss*

### 1. *Standard of Review*

■ For the purposes of a rule 12(b)(6) motion, the complaint is construed in the light most favorable to plaintiff and its allegations are taken as true. *See, e.g., Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 1081–82, 31 L.Ed.2d 263 (1972); *Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1533 (10th Cir.1992); *Williams v. Meese*, 926 F.2d 994, 997 (10th Cir.1991). The court's inquiry is directed to whether the allegations set forth in the complaint constitute a statement of a claim under rule 8(a). Rule 8(a) provides that the complaint need only set out a generalized statement of facts from which defendant will be able to frame a responsive pleading. In appraising the sufficiency of the allegations, "the complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *see Daigle*, 972 F.2d at 1533.

### 2. *Overview of Plaintiff's Claims*

Because plaintiff alleges a variety of statutory violations by defendants acting in diverse capacities, an overview of plaintiff's claims is warranted. Plaintiff's causes of actions set forth in his second amended complaint are as follows: (1) violations of sections 11 and 15 of the 1933 Act against Pittock, Hayden, Kerr, Acheson, and Fregosi; (2) violations of sections 10(b) and 20(a) of the 1934 Act, and rule 10b–5, against Pittock and Dickerson, and violations of section 20(a) against the remaining defendants, except Woodworth; (3) violations of section 13(a)(3) of the ICA against all defendants, except Dickerson; (4) violations of sections 8(b), 15(c) and 21 of the ICA against Hayden, Woodworth, Kerr, and Fregosi; (5) violations of section 17(e) of the ICA against Pittock and Dickerson; (6) violations of RICO against Pittock and Dickerson; (7) breach of fiduciary duties or violations as aiders and abettors of those breaches brought against all defendants; (8) violations of state securities laws, namely Colo.Rev.Stat. §§ 11–51–501(1)(a)–(c), 11–51–604(3) and (5)(c) (1987 & Supp.1995), against Pittock and Dickerson, and against remaining defendants as aiders and abettors of the primary state securities law violations; and (9) common law claims of gross negligence, bad faith, willful misfeasance, and reckless conduct against all defendants.

### 3. *Plaintiff's Securities Law Claims*

Plaintiff asserts claims under three federal securities statutes: (1) sections 11 and 15 of the 1933 Act; (2) sections 10(b) and 20(a) of the 1934 Act; and (3) sections 8, 13, 15, 17, and 21 of the ICA. Defendants argue that dismissal of these claims is appropriate for two reasons, primarily because the claims are time-barred. Defendants also maintain that plaintiff fails to allege facts sufficient to state any claims against defendants.

### a. **Statute of Limitations Under the 1933 and 1934 Acts**

The statute of limitations applicable to plaintiff's securities violation claim under section 11 (false registration statements) and section 15 (control person liability) is set forth in section 13 of the 1933 Act. 15 U.S.C.A. § 77m (West 1981). Section 13 provides in pertinent part as follows:

No action shall be maintained to enforce any liability created under section [11 or 12(2) ] of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such

discovery should have been made by the exercise of reasonable diligence.... In no event shall any such action be brought to enforce a liability created under section [11 or 12(1)] of this title more than three years after the security was bona fide offered to the public, or under section [12] of this title[,] more than three years after the sale.

15 U.S.C.A. § 77m; *see also Morley v. Cohen,* 610 F.Supp. 798 (D.Md.1985) (section 13 limitations period applies to section 15 violations). A similar limitations period applies to plaintiff's claims under the 1934 Act. Section 9(e) of the 1934 Act provides, in part, that:

No action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation.

15 U.S.C.A. § 78i(e) (West 1981). *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364 n. 9, 111 S.Ct. 2773, 2782 n. 9, 115 L.Ed.2d 321 (1991) (adopting section 9[e] as the appropriate limitations period for section 10[b] claims).

■ Thus, sections 13 and 9(e) establish a one-year statute of limitations framed by a three-year statute of repose. Under these provisions, plaintiff has one year from the date of discovery of a violation to file an action. Defendants who may be liable for such a violation, however, are free from liability if an action is not brought within three years of the violation itself. Because sections 13 and 9(e) are statutes of repose, not only is a remedy barred after three years, but the liability is extinguished. Therefore, an untimely complaint must be dismissed as a matter of law.

■ Plaintiff opposes application of *Lampf's* one-year/three-year statute to his section 10(b) claim. (Pl.'s Resp. at 54.) Plaintiff contends that *Lampf* is inapplicable to his claim on the following grounds: (1)

*Lampf* involved a dispute between a separate buyer and a distinct seller, whereas the unity of parties in this case presented a disabling condition that continued until the receiver was appointed; (2) *Lampf* assumed an aggrieved party who had an opportunity to discover actionable conduct upon the exercise of due diligence, and no degree of reasonable diligence in this case could have resulted in discovery of the fraudulent conduct before the receiver was appointed; (3) *Lampf* denied the doctrine of equitable tolling based upon fraudulent concealment, whereas plaintiff's argument relies upon the doctrine of adverse domination; and (4) *Lampf* established a limitations period for a purely private action, and in this case the receiver acted in a quasi-governmental enforcement role more akin to a public action. (Pl.'s Resp. at 55–60.) Plaintiff maintains that the one-year/three-year structure should not apply to his claims under the 1933 Act for the same four reasons.

Plaintiff's assertions are contrary to the law established in *Lampf.* In *Lampf,* the Court performed a detailed statutory analysis to determine the congressional intent with respect to the appropriate period of limitations to be applied to a section 10(b) claim.[5] The fact that *Lampf* involved a separate buyer and seller is a distinction without a difference. Rather than undermining the applicability of the *Lampf* holding, plaintiff's first and second arguments merely address when the statute of limitations began to run, not which statute of limitations applies to the claim. Further, the Supreme Court specifically considered and rejected the notion that equitable tolling could extend the three-year period of repose, stating:

Notwithstanding this venerable principle, it is evident that the equitable tolling doctrine is fundamentally inconsistent with the 1-and-3-year structure.... The inclusion of the three-year period can have no significance in this context other than to impose an outside limit.... Because the

---

**5.** First, a court must determine whether a uniform statute of limitations should be selected. *Lampf,* 501 U.S. at 357, 111 S.Ct. at 2779. Second, assuming a uniform limitations period is appropriate, a court must decide whether this period should be derived from a state or federal

source. *Id.* Finally, even when federal borrowing appears appropriate, a court must determine whether the analogous federal source truly affords a "closer fit" with the cause of action at issue than does any available state-law source. *Id.*

purpose of the 3–year limitation is clearly to serve as a cutoff, we hold that tolling principles do not apply to that period.

*Lampf,* 501 U.S. at 363, 111 S.Ct. at 2782 (citation omitted). Consequently, no concept of equitable tolling can have validity beyond the three-year period of repose. *Id.* Similarly, I conclude as a matter of law that the adverse domination doctrine does not operate to toll the one-year/three-year statute applicable to plaintiff's claim. Moreover, plaintiff's attempt to distinguish this case as a public action rather than a private action is unsupported. Although receivers may be shielded by principles of immunity, that does not convert their claims into public actions for purposes of the securities laws. A receiver's claim is distinct from an SEC action because it seeks damages, which the SEC is not authorized to pursue under the applicable five-year statute of limitations. Plaintiff provides no authority for his proposition that a receiver is not subject to the one-year/three-year period of limitations. I thus conclude that the one-year/three-year period of limitations specified in sections 13 and 9(e) applies to plaintiff's claims under the 1933 and 1934 Acts.

### b. Application of the Statute of Limitations and Repose

■ The applicable one-year statute of limitations begins to run when plaintiff receives (1) actual knowledge of the facts giving rise to the action or (2) constructive notice of the facts, which in the exercise of due diligence, would have led a reasonable person to actual knowledge. *See In re General Dev. Corp. Bond Litig.,* 800 F.Supp. 1128, 1142 (S.D.N.Y.1992), *aff'd sub nom. Menowitz v. Brown,* 991 F.2d 36, 41–42 (2d Cir.1993). Inquiry notice is sufficient to constitute discovery and is triggered by evidence of the possibility of fraud. *See Kennedy v. Josephthal & Co.,* 814 F.2d 798, 802 (1st Cir.1987). Plaintiff is put on constructive or inquiry notice when he receives "sufficient storm warnings to alert a reasonable person to the possibility that there were either misleading statements or significant omissions involved in the sale." *Cook v. Avien, Inc.,* 573 F.2d 685, 697 (1st Cir.1978). Although parties seeking summary disposition have a

difficult burden in showing there are no material issues of fact regarding notice, the issue may be resolved as a matter of law when uncontroverted evidence irrefutably demonstrates plaintiff discovered or should have discovered the fraudulent conduct. *Davis v. Birr, Wilson & Co.,* 839 F.2d 1369, 1370 (9th Cir.1988).

■ Even if plaintiff were not on inquiry notice of the violations at issue here, the statute of repose provides that a violation is actionable only within three years following the date of (1) a public offering or (2) an alleged violation. In this case, the statute of repose accrued on the purchase date of the leases. *See In re Colonial Ltd. Partnership Litig.,* 854 F.Supp. 64, 85 (D.Conn.1994) (section 10[b] claim must be brought within three years of the date of "purchase" of securities). Defendant Pittock, in conjunction with most of the defendants, maintains that because this action was initiated on November 5, 1993, any violation that occurred prior to November 5, 1990, is barred by the absolute three-year period of repose. (Pittock Br. at 6.) Pittock correctly notes that of the four Indian lease transactions, only the Chippewa Cree purchased on November 8, 1990, is not barred by the three-year statute of repose. Further, with respect to the excessive commissions paid by CMAT and NMAT as a result of defendants' actions, only the Chippewa Cree transaction survives the three-year statute of repose. (*See* Pl.'s Resp., Ex. 2.) Moreover, the Alpine lease transaction on April 4, 1990, and the Los Luceros loan on November 8, 1988, also fall outside the maximum three-year statute of repose. However, I do not agree with Pittock concerning the status of the juice vending machine leases, as the underlying service agreement in that matter was not entered into until February 28, 1991. (*See* Pl.'s Resp. at 15.)

Therefore, the only transactions not absolutely barred by the statute of repose under the 1933 and 1934 Act claims are (1) the Chippewa Cree lease, (2) the juice vending machine lease, and (3) CMAT's improper monthly distributions in excess of its earnings during the months of March 1991, and May through October 1991. Not surprisingly, defendants maintain these transactions

are, nonetheless, untimely under the one-year statute of limitations. (*See* Pittock Br. at 6.) Plaintiff resists application of the one-year limitation as a bar to his securities law claims on the basis that the statute did not begin to run until he was appointed receiver on November 25, 1991. (*See* Second Am. Compl. ¶¶ 36, 42, 51, 60.) In any event, plaintiff maintains that the application of the statute of limitations presents a question of fact for the jury. (Pl.'s Resp. at 63.)

■ To the extent plaintiff's claims are not barred under the three-year statute of repose, however, his claims are still barred as untimely if the one-year statute of limitations began to accrue on November 25, 1991, as plaintiff maintains, because he did not bring this action by November 25, 1992. Plaintiff's claims likewise would be barred if the statute of limitations began to accrue on January 31, 1992, when plaintiff filed his first receiver's report. In that report, plaintiff irrefutably acknowledges inquiry notice of default under (1) the Chippewa Cree lease and (2) the promissory note involved in the juice vending machine agreements. While plaintiff's report does not refer specifically to CMAT's excessive monthly distributions, it is clear that plaintiff had information sufficient to constitute inquiry notice of such violations by January 31, 1992. Accordingly, plaintiff should have filed his claims under the 1933 and 1934 Acts by *at least* January 31, 1993. Because plaintiff did not initiate this suit until November 5, 1993, I find that the claims not otherwise barred by the three-year statute of repose are, nonetheless, barred as untimely under the applicable one-year statute of limitations. Therefore, I dismiss plaintiff's claims under the 1933 and 1934 Acts.

### c. Statute of Limitations Under the Investment Company Act

Plaintiff's ICA claims against Pittock and Dickerson are based on alleged violations of (1) 15 U.S.C.A. § 80a–13(a)(3), which proscribes deviations from an ICA company's investment policy in the absence of shareholder approval, and (2) 15 U.S.C.A. § 80a–17(e)(2), which limits a broker's commission in connection with investment company transactions. The ICA claims against the Trustees are premised upon (1) 15 U.S.C.A. § 80a–8(b)(1) to –8(b)(3), which governs information required in an investment company's registration statement, (2) 15 U.S.C.A. § 80a–15(c), which prohibits investment companies from entering into a new contract or agreement without approval of a majority of the board of directors, and (3) 15 U.S.C.A. § 80a–21, which prohibits loans in contravention of investment policies.

The parties disagree as to the appropriate limitations period to be applied to the ICA claims. Plaintiff contends that the appropriate limitations period is (1) the five-year period found in section 36(a) of the ICA or (2) the analogous state statute of limitations for breach of fiduciary duty, which is three years and is subject to tolling pursuant to applicable Colorado and/or Massachusetts law. (Pl.'s Resp. at 67–68.) Defendants, on the other hand, urge the court to adopt the one-year/three-year limitations period applied to claims under the 1933 and 1934 Acts. Defendants rely on case law rejecting the SEC's five-year limitations period when applied to a private right of action under the ICA. *See In re ML–Lee Acquisition Fund II, L.P.,* 848 F.Supp. 527 (D.Del.1994) (applying one-year/three-year limitations to ICA claims under sections 17, 36, and 57); *Omni Fin. Corp. v. Cohen,* No. 91–6837, 1994 WL 97125, at *7 (S.D.N.Y. Mar. 22, 1994) (applying one-year/three-year limitations to ICA claim under section 20[a]); *In re Taxable Mun. Bond Sec. Litig.,* No. 92–863, 1992 WL 124783, at *3 (E.D.La. June 4, 1992) (applying one-year/three-year limitations period to private claims under ICA sections 7 and 8), *aff'd,* 964 F.2d 1144 (5th Cir.1992).

■ In determining the appropriate limitations period for claims brought pursuant to the ICA, the court is guided by the principles set forth in *Lampf.* The *Lampf* Court stated that when a claim is implied under a statute that also contains an express cause of action with its own time limitation, a court should look first to the statute of origin to ascertain the proper limitations period. *Id.* at 359, 111 S.Ct. at 2780. "Only where no analogous counterpart is available should a court then proceed to apply state-borrowing principles."

*Id.* The ICA contains two limitations periods: (1) section 36(a), which gives the SEC five years to bring an action for breach of fiduciary duty involving personal misconduct against a director or an investment advisor of a mutual fund, or a principal underwriter of an open-end investment company; and (2) section 36(b), which grants the SEC or a shareholder the right to sue the fund's investment advisors for breach of fiduciary duties regarding compensation or payments within one year thereof. Plaintiff maintains that because a receiver's role is more akin to a regulatory cause of action for personal misconduct than to a private right of action, section 36(a) should apply to the ICA claims. (Pl.'s Resp. at 67.) Under the principles established in *Lampf,* however, the proper inquiry for determining the applicable statute of limitations is whether the right of action created in 36(a) or (b) compares with the implied rights of actions at issue here.

■■■ Section 36(a), which is not implicated in plaintiff's complaint, creates a right of action in favor of the SEC against certain management personnel who have "engaged within five years of the commencement of the action.... in any act or practice constituting a breach of fiduciary duty." 15 U.S.C.A. § 80a–35(a). In *Lampf,* the Court rejected application of the five-year statute of repose specified in section 20 of the 1934 Act because that section focused upon a specific problem—insider trading. *Lampf,* 501 U.S. at 361–62, 111 S.Ct. at 2781. The same proposition holds true for section 36—subsection 36(a) provides the SEC with a specific, narrow right of action. There is no indication that the drafters of that section sought to extend the enhanced protection of five years to other sections of the ICA. Even if section 36 could be considered comparable to plaintiff's claims under the ICA, subsection (b) is more analogous than subsection (a) because section 36(b) is not limited to a public right of action. I find, however, that section 36(b) also focuses on too specific a problem. Subsection (b) restricts the challenged conduct to breaches of fiduciary duties related to compensation or payments to an investment advisor. 15 U.S.C.A. § 80a–35(b). This subsection does not expressly authorize the SEC or a security hold-

er to bring an action challenging a fiduciary's general performance of duties. *See Taxable Mun. Bond,* 1992 WL 124783, at *4. Plaintiff repeatedly asserts in his response brief that the nature of his ICA action is primarily for breach of fiduciary duties. (Pl.'s Resp. at 2–9.) I find that there is an insufficient commonality of purpose between section 36 and plaintiff's ICA claims.

■■■ Having determined that the statute of origin does not contain a limitations period that should be adopted, I must determine whether to borrow a limitations period from another federal source or from a state source. To resolve this issue, the *Lampf* Court's three-part hierarchical test is instructive. *See Lampf,* 501 U.S. at 355–56, 111 S.Ct. at 2778. First, it is undeniable that federal interests in predictability and judicial economy counsel adoption of a uniform limitations period for claims asserted under the ICA. Second, I find that a uniform limitations period should derive from a federal source. ICA claims are multi-state in nature, thereby supporting adoption of a federal limitations period. Lastly, I must determine that an analogous federal source truly affords a "closer fit" with the cause of action at issue than does any available state-law source. *Id.,* at 355–56, 111 S.Ct. at 2778. The ICA sections at issue here fit closely with causes of action subject to the one-year/three-year limitations period under the 1933 and 1934 Acts because the ICA sections and the 1933 and 1934 Acts are intended to facilitate the same central goal of protecting investors, in part by imposing similar restrictions and reporting requirements. Plaintiff's ICA causes of action share many of the goals contained within the 1933 and 1934 Acts. *See Taxable Mun. Bond,* 1992 WL 124783, at *6. Those Acts, like the ICA, were designed to eliminate abuses in the securities industry. *Id.* Other courts that have considered this question agree, and have consistently applied the one-year/three-year period from the 1933 and 1934 Acts to claims under the ICA. *See ML–Lee Acquisition Fund,* 848 F.Supp. at 551; *Omni Fin. Corp.,* 1994 WL 97125, at *9; *Taxable Mun. Bond,* 1992 WL 124783, at *6.

The application of the one-year/three-year statute of limitations to plaintiff's ICA claims is identical to my analysis under the 1933 and 1934 Acts because the underlying transactions involved are the same. I therefore dismiss plaintiff's claims under the ICA for the same reasons I rejected plaintiff's claims under the 1933 and 1934 Acts. Because I dismiss plaintiff's claims as time-barred under the applicable statutes of limitations and repose, I need not reach defendant's arguments regarding the sufficiency of plaintiff's claims under the federal securities laws.

### 4. Plaintiff's RICO Claims

To state a claim under RICO, plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *See Phelps v. Wichita Eagle–Beacon*, 886 F.2d 1262, 1273 (10th Cir.1989) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 [1985]); *Weiszmann v. Kirkland and Ellis*, 732 F.Supp. 1540, 1545 (D.Colo.1990); 18 U.S.C.A. §§ 1961(1) and (5), 1962(c), 1964(c) (West 1984). Plaintiff alleges that Pittock and Dickerson violated RICO by engaging in various acts of securities fraud as prohibited by section 10(b) of the 1934 Act and section 11 of the 1933 Act. (Second Am.Compl. ¶ 47; Pl.'s Resp. at 37.) Defendants Pittock and Dickerson maintain that plaintiff's RICO claim must be dismissed because plaintiff failed to sufficiently plead (1) a pattern, because he fails to show both continuity and relationship of predicate racketeering acts, and (2) a predicate act of racketeering activity, because he has not alleged any act of deception in connection with the sale of a security. (Pittock Br. at 20–21.)

#### a. Pattern of Racketeering Activity

■ A pattern of racketeering activity requires a showing of "continuity plus relationship." *Boone v. Carlsbad Bancorporation, Inc.*, 972 F.2d 1545, 1555 (10th Cir.1992) (quoting *Sedima*, 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14); *Phelps*, 886 F.2d at 1273. The relationship test is not overly cumbersome. Plaintiff must only demonstrate that the requisite predicate acts "have the same or similar purposes, results, partici-

pants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 240, 109 S.Ct. 2893, 2901, 106 L.Ed.2d 195 (1989), *cert. denied*, 504 U.S. 957, 112 S.Ct. 2306, 119 L.Ed.2d 228 (1992); *see Boone*, 972 F.2d at 1555.

■ In this case, the acts alleged to form the basis of plaintiff's RICO claim are defendants' purchase and acquisition of impermissible and unsuitable assets and investments. Among the transactions at issue are (1) the Indian leases, (2) the Alpine lease, and (3) the Los Luceros loan. (Second Am.Compl. at 24–25; Pl.'s Resp. at 37–38.) Plaintiff maintains that in each of those transactions defendants conducted a manipulative scheme in order to benefit from excessive management fees and commissions. (Second Am. Compl. 22–26.) Assuming plaintiff's assertions are true, defendants' purpose in purchasing each of the improper investments was arguably to generate an excessive profit for themselves. A similar result from each of the transactions would have occurred if the SEC had not placed the funds in receivership. Further, the defendants' victims were consistently Alpine, CMAT, and NMAT. All of these considerations warrant a finding that a relationship existed among the alleged acts, thereby establishing, in part, a pattern of racketeering. Accordingly, I find that plaintiff has sufficiently alleged a relationship for purposes of the instant motion.

■ To establish a pattern under RICO, plaintiff must also show that the alleged predicate acts amount to, or otherwise constitute a threat of, "*continuing* racketeering activity." *Id.* "Continuity" is both a closed-ended and open-ended concept. *Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1543 (10th Cir.1993). Plaintiff "may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *Id.* (citing *H.J., Inc.*, 492 U.S. at 242, 109 S.Ct. at 2902); *see Phelps*, 886 F.2d at 1273. In contrast, "[o]pen-ended continuity depends upon the facts of each case, and may be established by showing that the predicates

themselves involve a distinct threat of long-term racketeering activity...." *Stone*, 998 F.2d at 1543 (citing *H.J., Inc.*, 492 U.S. at 242–43, 109 S.Ct. at 2902). Two factors are particularly relevant to the determination of continuity—the duration of the related predicate acts and the extensiveness of the underlying scheme. *Id.*

■ Defendants assert that plaintiff cannot establish continuity because the duration of their activity with respect to the transactions at issue was too brief. The first transaction allegedly involved in defendants' scheme is the Los Luceros loan, which was made on November 7, 1988. Plaintiff contends that defendants caused NMAT to improperly omit disclosure of, or make false and misleading disclosure of, material facts regarding the loan from November 1988 to August 24, 1989. (Second Am.Compl. at 25.) Further, omissions or false disclosures were made in SEC filings from August 24, 1989, through January 19, 1990. (*Id.*) Next, defendants' involvement in improper lease transactions began when the first Indian lease was purchased on January 31, 1990, and ended when the last lease was purchased on November 8, 1990. (Second Am.Compl., Exs. 1, 3.) The duration of the scheme, therefore, could constitute at least two years. While predicate acts extending over a few weeks or months are insufficient to show closed-ended continuity, courts have recognized a pattern of racketeering activity for periods less than two years. *Stone*, 998 F.2d at 1544–45 (evidence allowing jury to infer that scheme lasted from seven or eight months to eighteen months was sufficient). Thus, I find that the duration of a scheme is sufficiently pled. Accordingly, I reject defendants' argument to dismiss plaintiff's RICO claim for failure to allege a "pattern."

**b. Predicate Acts of Racketeering Activity**

■ Plaintiff argues that he has sufficiently alleged a RICO predicate act based upon defendants' violation of section 10(b) of the 1934 Act and section 11 of the 1933 Act. (Pl.'s Resp. at 37.) Section 10(b) of the 1934 Act prohibits the use "in connection with the *purchase or sale* of any security" of any

manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe. 15 U.S.C.A. § 78j(b) (emphasis added). Pursuant to this section, the SEC promulgated rule 10b–5, which provides in relevant part:

> It shall be unlawful for any person ...
>
> (a) [t]o employ any device, scheme, or artifice to defraud,
>
> (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
>
> (c) [t]o engage in an act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. Section 11 of the 1933 Act imposes civil liability upon a person who prepares, signs, and files misleading registration statements with the SEC in connection with public offerings of securities. 15 U.S.C.A. § 77k. Plaintiff's allegations of securities law violations may be summarized as follows: (1) defendants participated in manipulative schemes known as "marking up a security," "flipping," and "churning"; (2) defendants knew of misrepresentations and omissions of material facts regarding the Los Luceros loan, or acted with reckless disregard of the truth or falsity of facts by failing to ascertain and disclose facts ascertainable or available to them; (3) defendants engaged in acts, practices, and a course of conduct which caused Alpine, NMAT, and/or CMAT to purchase unsuitable securities. (Second Am.Compl. ¶¶ 26, 30–31.) *See O'Connor v. R.F. Lafferty & Company, Inc.*, 965 F.2d 893, 897 (10th Cir.1992) (recognizing unsuitable investment claim as a violation of section 10[b] and rule 10b–5).

According to defendants, plaintiff's allegations fail to establish a predicate act of racketeering activity because (1) there is no allegation that defendants were "sellers" of securities and (2) plaintiff fails to state a claim for securities fraud. (Reply of Defs. Pittock, Alpine Capital Management Corporation, and Alpine Municipal Leasing Corp. to Pl.'s Com-

bined Resp. in Opp'n to Defs.' Mot. to Dismiss at 14 [filed Aug. 15, 1994] [hereinafter "Pittock's Reply"].) RICO's section 1961(1)(D) defines racketeering activity to include "any offense involving ... fraud in the *sale* of securities." 18 U.S.C.A. § 1961(1)(D) (emphasis added). Section 1961(1)(D) neither defines "fraud in the sale of securities" nor cross-references any specific statutory section. *See Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 280–81, 112 S.Ct. 1311, 1324, 117 L.Ed.2d 532 (1992) (O'Connor, J. concurring). Furthermore, the legislative history provides no guidance on the intended scope of this language. *Id.*

Defendants argue that conduct actionable under RICO is limited to fraud involving the "sale" of securities. Defendants maintain that plaintiff's RICO claim must be dismissed because his allegations are limited to the "purchase" of securities. Plaintiff has not directly addressed this issue in his response. Neither the Supreme Court nor the Tenth Circuit has determined whether RICO prohibits fraudulent conduct committed in both the *purchase and sale* of securities. Other federal courts have disagreed as to whether Congress intended "fraud in the sale of securities" to reach as broad a range of conduct as fraud "in connection with the purchase or sale of any security" under section 10(b). *See Colonial Ltd. Partnership*, 854 F.Supp. at 106 ("fraud in the sale of securities" is not limited to actual sellers); *In re Crazy Eddie Sec. Litig.*, 812 F.Supp. 338, 351 (E.D.N.Y. 1993) (same); *In re American Continental Corp./Lincoln Sav. & Loan Sec. Litig.*, 794 F.Supp. 1424, 1465 (D.Ariz.1992) (fraud in the sale of securities does not require defendants' participation in the actual sale); *In re Catanella and E.F. Hutton and Co. Sec. Litig.*, 583 F.Supp. 1388, 1425 n. 56 (E.D.Pa. 1984) (violation of section 10[b] and rule 10b–5 involving fraud in "purchase" of securities can be predicate offense). *But see In re Par Pharmaceutical, Inc. Sec. Litig.*, 733 F.Supp. 668, 683–84 (S.D.N.Y.1990) (securities fraud is only a predicate offense if the fraud occurs in the actual sale of a security); *First Pacific Bancorp, Inc. v. Bro*, 847 F.2d 542, 546 (9th Cir.1988) (no RICO predicate act where there was no sale of securities).

Justice O'Connor cast substantial doubt upon the strength of the argument that "fraud in the sale of securities" under RICO was intended to exclude fraudulent conduct occurring in the "purchase" of securities in her concurring opinion in *Holmes*. *See Holmes*, 503 U.S. at 286, 112 S.Ct. at 1327 ("I would sustain the Court of Appeals' determination that RICO plaintiffs alleging predicate acts of fraud in the sale of securities need not be actual purchasers or sellers of the securities at issue."). Furthermore, Justice O'Connor stated that RICO "unmistakably requires that there be fraud, sufficiently willful to constitute a criminal violation, and that there be a sale of securities." *See id.* at 283, 112 S.Ct. at 1325. "A predicate offense does not necessarily dictate that a RICO plaintiff have been a party to an executed sale." *Id.* Accordingly, I conclude that non-sellers who *willfully* violate section 10(b) may be liable under RICO. *See Colonial Ltd. Partnership*, 854 F.Supp. at 106 (same). My conclusion, however, raises a critical issue in the instant motion—whether plaintiff has alleged "willful conduct sufficient to constitute a criminal violation."

■ A defendant acts "willfully" within the meaning of RICO if he acts "deliberately and intentionally and his acts, statements, or omissions are not the result of innocent mistake, negligence, inadvertence or other innocent conduct. *Id.* (citation omitted). Plaintiff relies upon *Hackbart v. Holmes*, 675 F.2d 1114, 1117 (10th Cir.1982), in his assertion that "reckless behavior satisfies the *scienter* requirement" for his RICO claim. (Pl.'s Resp. at 30 n. 31.) Plaintiff's argument, however, is inapposite because *Hackbart* was limited to the level of intent required to allege a violation under the securities laws; it did not address the *mens rea* requirements of RICO. *See Hackbart*, 675 F.2d at 1117–18.

■ Prior to the *Holmes* decision, some courts had stated that "RICO causes of action do not have a separate mens rea requirement but rely on that found in the predicate offense." *See Lochhead v. Alacano*, 697 F.Supp. 406 (D.Utah 1988) (citing *United States v. Biasucci*, 786 F.2d 504, 512 [2d

Cir.], *cert. denied,* 479 U.S. 827, 107 S.Ct. 104, 93 L.Ed.2d 54 [1986] ). The line of cases relied upon in support of that assertion, however, has been distinguished from the issue at hand because those cases did not address whether RICO liability could be based on reckless disregard; rather "they were concerned only with whether RICO requires a finding of *criminal intent* to violate RICO in addition to the criminal intent required by the law prohibiting the predicate act." *See Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg,* 660 F.Supp. 1362, 1370 & n. 6 (D.Conn.1987) (emphasis included). In *Andreo,* the court held that mere reckless disregard of the truth does not justify a finding of RICO civil liability. *Id.* The *Andreo* court stated:

> The primary purpose of the RICO statute is to provide an additional tool to combat organized crime. The reach beyond "traditional organized crime and comparable ongoing structured criminal enterprises was intended to be incidental and to exist only to the extent necessary to maintain the constitutionality of [the] statute." If liability could be based on assistance given to a RICO enterprise without knowledge of the illegal activities of the enterprise, the reach of the statute beyond traditional organized crime would be far more than "incidental."

*Id.* at 1371 n. 7 (citations omitted); *see In re Integrated Resources Real Estate Ltd. Partnerships Sec. Litig.,* 850 F.Supp. 1105, 1145 n. 56 (S.D.N.Y.1993) (racketeering activity is defined to mean various criminal acts, requiring *mens rea;* defendant must have acted knowingly and willfully); *Moss v. Morgan Stanley, Inc.,* 553 F.Supp. 1347, 1362 (S.D.N.Y.) (no participation in RICO scheme where defendant was allegedly negligent or reckless in aiding and abetting), *aff'd,* 719 F.2d 5 (2d Cir.1983), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984); *see also Stagner v. Pitts,* No. 92–345, 1993 WL 375809, at *5 (10th Cir. Sept. 20, 1993) (racketeering activity must amount to or pose a threat of continued criminal activity). Thus, I conclude that under section 1961(1)(D), racketeering activity is defined to mean various *criminal* acts, requiring *mens rea. See Integrated Resources,* 850 F.Supp.

at 1145 n. 56. In other words, a finding of racketeering activity requires *indictable criminal* conduct. *See id.* (citing *Solano v. Delmed, Inc.,* 759 F.Supp. 847, 852 [D.D.C. 1991] [holding RICO liability attaches where "indictable criminal conduct" exists] ). Therefore, because only criminal violations suffice as predicate acts under RICO, plaintiff must allege that defendants committed the acts willfully or with actual knowledge of the illegal activities. *See id.*

▮ In support of plaintiff's argument that he has sufficiently alleged the scienter element in this case, he refers to the portion of his second amended complaint which states as follows:

> Defendants Pittock and Dickerson knew of the misrepresentations and omissions of material facts, or acted with reckless disregard for their truth or falsity, by failing to ascertain and disclose the true facts when such facts were ascertainable by or available to them.

(Second Am.Compl. ¶ 31.) Without repeating the pertinent facts set forth earlier in this order, I note that I have carefully reviewed the record and heard oral argument on this matter in search of a modicum of sufficient allegations that defendants acted willfully or with the requisite level of knowledge. The only additional statement in plaintiff's second amended complaint which describes defendants' acts as anything more than recklessness provides as follows:

> [Defendant Pittock's] ... actionable conduct also includes knowledge, approval or ratification of alleged violations of law by Alpine, its affiliates and other Defendants during the period prior to becoming an Alpine Trustee or affiliate of Alpine.

(*Id.* ¶ 7.)

It is critical to note that nowhere in plaintiff's second amended complaint is an allegation that defendants acted in a willful manner sufficient to constitute criminal fraud. Under Fed.R.Civ.P. 9(b), plaintiff must sufficiently allege each element of a RICO violation and its predicate acts of racketeering with particularity. *See Farlow v. Peat, Marwick, Mitchell & Co.,* 956 F.2d 982, 989 (10th Cir.1992). I find that plaintiff has wholly

failed to allege that defendants acted in a *willful* manner. While plaintiff's complaint states the requisite word "knowledge" in the two passages noted above, these conclusory allegations are insufficient to withstand the motion to dismiss. Although knowledge and other conditions of mind may be averred generally, plaintiff must, nonetheless, specifically allege the events which give rise to a strong inference that defendants had knowledge of their wrongful conduct, misrepresentations, or omissions. *See O'Brien v. Price Waterhouse*, 740 F.Supp. 276 (S.D.N.Y.1990) (citations omitted), *aff'd*, 936 F.2d 674 (2d Cir.1991). Plaintiff has failed to set forth any facts or circumstance suggesting that defendants acted deliberately or intentionally. In fact, he specifically states that his securities fraud violation claim is premised upon *reckless conduct*. (Pl.'s Resp. at 30 n. 31.) He repeated this position at oral argument. I thus conclude that plaintiff's RICO claim must be dismissed for failure to adequately allege actionable conduct. Accordingly, I need not reach defendants' additional arguments concerning plaintiff's failure to state a claim against defendants.

### 5. Pendent State Claims

▪▪▪ Defendants have moved to dismiss plaintiff's (1) state securities law claims and (2) state common-law claims for fraud, breach of fiduciary duties, gross negligence, bad faith, willful misfeasance, and reckless conduct. Pursuant to 28 U.S.C.A. § 1367(a), a district court has supplemental jurisdiction over all claims that form part of the same case or controversy involved in a civil action in which the district court has original jurisdiction. *See* 28 U.S.C.A. § 1367(a). Under section 1367(c)(3), a district court may decline to exercise supplemental jurisdiction if the court has dismissed all claims over which it has original jurisdiction. *See* 28 U.S.C.A. § 1367(c)(3). When supplemental jurisdiction is founded solely upon a federal question, and the federal claim is dismissed, a district court is free to dismiss the remaining state claims without prejudice to renew them in state court. *See Keystone Builders, Inc. v. Floor Fashions of Virginia, Inc.*, 829 F.Supp. 181, 185 (W.D.Va.1993). The decision to accept or decline jurisdiction of a state claim lies within the sound discretion of the trial court. *See Jarvis v. Nobel/Sysco Food Servs. Co.*, 985 F.2d 1419, 1424 (10th Cir.1993); *Johnston v. CIGNA Corp.*, 755 F.Supp. 339, 344 (D.Colo.1991) (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 [1966] ), *aff'd*, 14 F.3d 486 (10th Cir.1993). In this matter I have dismissed all plaintiff's federal law claims, therefore, I decline to exercise jurisdiction over plaintiff's state law claims. Accordingly, those claims are dismissed without prejudice.

### Defendants' Motions for Sanctions

Federal Rules of Civil Procedure provide, in part:

> By presenting to the court ... a pleading, written motion, or other paper, an attorney ... is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the claims ... and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law; [and that] the allegations and other factual contentions have evidentiary support....

Fed.R.Civ.P. 11(b).

▪▪▪ In determining whether or not to impose sanctions for a violation of Rule 11, the court must apply an objective standard; in other words, I must determine whether a reasonable and competent attorney would believe in the merit of plaintiff's argument. *See Dodd Ins. Servs., Inc. v. Royal Ins. Co. of Am.*, 935 F.2d 1152, 1158 (10th Cir.1991). The court may impose attorney fees as an appropriate sanction when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, or delays or disrupts the litigation or hampers a court order's enforcement. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27, *reh'g denied*, 501 U.S. 1269, 112 S.Ct. 12, 115 L.Ed.2d 1097 (1991); *Sterling Energy, Ltd. v. Friendly Nat'l Bank*, 744 F.2d 1433, 1435 (10th Cir.1984).

I find that plaintiff's claims in this case were not so frivolous as to warrant sanctions pursuant to Rule 11. In dismissing plaintiff's claims, I found two issues dispositive: (1) the non-tolling application of the statute of limitations and repose to plaintiff's securities law claims; and (2) the absence of fraud allegations sufficiently willful to constitute a criminal violation under RICO. As the federal courts' differing interpretation and application of the pertinent law and my lengthy analysis of these matters show, I cannot say that it was "patently clear" that plaintiff's claims had "absolutely no chance of success." *See Oliveri v. Thompson,* 803 F.2d 1265, 1275 (2d Cir.1986), *cert. denied,* 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987). Therefore, I deny defendants' motions for sanctions pursuant to Rule 11.

### Defendants' Motions for Judgment on the Pleadings on the Counterclaim for Indemnification

Several defendants asserted a counterclaim against plaintiff pursuant to (1) section 6.4 of Alpine's Master Trust Agreement and/or (2) article 4 of the Management Agreement between Alpine and Alpine Capital, which require Alpine to indemnify Alpine Capital (and its directors, officers, and employees) and the Trustees for all claims and costs incurred as a result of their tenure so long as (1) Alpine Capital acted in good faith, with due diligence, and without gross negligence and (2) the Trustees did not participate in "disabling conduct" as defined under the Master Trust Agreement.

Defendants urge this court to grant their various counterclaims for indemnification in the event plaintiff's claims against them were dismissed on the ground that plaintiff failed to state a claim for gross negligence and willful misfeasance. Defendants argue that such dismissal would mean the court had determined that defendants had (1) acted in good faith and (2) not engaged in any "disabling conduct."

Contrary to defendants' assertions, I have not determined whether defendants acted (1) in good faith, (2) with due diligence, (3) without gross negligence, or if they engaged in any disabling conduct as defined under the terms of the Master Trust Agreement. My dismissal of plaintiff's claims was unrelated to the relevant common-law doctrines involved in defendants' indemnification argument. In fact, I have refused to exercise supplemental jurisdiction over plaintiff's state common-law claims. I have not denied plaintiff's claims on the ground that he failed to state a claim for gross negligence and willful misfeasance. Accordingly, defendants' motions for judgment on the pleadings are denied. Nonetheless, defendants are free to pursue appropriate remedies in state court.

### CONCLUSION

Based on the foregoing, it is therefore ORDERED as follows:

1. Defendants' motions to dismiss plaintiff's claims are GRANTED.

2. Plaintiff's claims arising under federal law (first, second, third, seventh, eighth, and ninth) are dismissed with prejudice. The claims arising under state law are dismissed without prejudice for want of subject matter jurisdiction.

3. Defendants' motions for sanctions are DENIED.

4. Defendants' motions for judgment on the pleadings are DENIED, but their counterclaims are dismissed without prejudice for want of subject matter jurisdiction.